UNITED STATES of America, Appellee,

v.

Chaim LEVY, Defendant–Appellant.

No. 808, Docket 93–1292.

United States Court of Appeals,
Second Circuit.

Argued Feb. 15, 1994.

Decided June 3, 1994.

---

David Schoen, Montgomery, AL, for defendant-appellant.

Emily Berger, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., Susan Corkery, Julie Copeland, Asst. U.S. Attys., on the brief), for appellee.

Before: NEWMAN, Chief Judge, MAHONEY and CAMPBELL,* Circuit Judges.

JON O. NEWMAN, Chief Judge:

This appeal primarily concerns problems stemming from a criminal defendant's representation by an attorney subject to various conflicts of interest. Chaim Levy appeals from the April 12, 1993, judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, Judge), convicting him, after a jury trial, on five counts of conspiring to possess and possessing heroin with the intent to distribute, in violation of 21 U.S.C. §§ 841, 846 (1988). On appeal, Levy challenges his conviction and sentence on numerous grounds, his most significant complaint being that he was denied the effective assistance of counsel in violation of the Sixth Amendment as a consequence of his lawyer's conflicts of interest. We conclude that Levy's rights under the Sixth Amendment were impaired, and we

reverse his conviction and remand for a new trial.

## Background

Defendant-appellant Chaim Levy, his nephew Eliahu Levy ("Eliahu"), and Yacob Elimelekh worked together to coordinate drug transactions in New York and Israel. The Government uncovered this operation with the help of a confidential informant who engaged in various heroin transactions involving Levy, Eliahu, and Elimelekh. In June 1989, after the arrest of his nephew Eliahu in the United States, an arrest warrant was issued for Chaim Levy, who was then in Israel. Attorney Ivan Fisher, who had served as Levy's counsel in a prior drug case, informed the Government that he represented both Levy and Eliahu.

In the course of plea negotiations on Eliahu's behalf, Fisher tried to arrange for Levy to assist the Government in exchange for "cooperation" credit for Eliahu.[1] During these negotiations, both Levy and Fisher made various statements that inculpated Levy. Eliahu ultimately rejected any plea bargain and was formally indicted on August 31, 1989. On October 4, 1989, Eliahu was inadvertently released from custody and fled the United States, apparently to Israel. The Government came to believe that Fisher might have been involved in Eliahu's flight.

Meanwhile, Levy traveled to Egypt in September of 1989, where he was arrested. Levy was then formally indicted in the Eastern District of New York and was extradited to the United States in late October 1989. From this point on, Levy's case has a complicated history, which appears to have contributed to the inadequate trial court exploration of the conflict issues raised on this appeal. Levy's case was initially assigned to Judge Reena Raggi, who recused herself because her division had prosecuted Levy when she was with the U.S. Attorney's Office for the Eastern District of New York. Next, Judge Joseph M. McLaughlin handled the case until

---

* The Honorable Levin H. Campbell of the United States Court of Appeals for the First Circuit, sitting by designation.

1. The applicable extradition agreement precluded the United States from returning Levy from Israel. Apparently believing he would never be tried on the charges against himself, Levy sought to help Eliahu by facilitating the Government's capture of others in the drug trade.

he was elevated to the Court of Appeals. Judge Leo I. Glasser then received the case, but his schedule required a further reassignment. Judge Weinstein took over for the remainder of Levy's prosecution and trial, except for one day during jury deliberations when he was ill and Judge Eugene H. Nickerson presided.

Fisher continued to represent both Levy and Eliahu upon Levy's return to the United States. Though never formally moving to disqualify Fisher, the Government repeatedly alerted the District Court to what it believed were Fisher's conflicts of interest. Specifically, the Government presented four grounds that it suggested would preclude Fisher's continuation as defense counsel for Levy: (1) Fisher's joint representation of Levy and Eliahu; (2) Fisher's status as a defendant awaiting his own sentencing in the Eastern District on unrelated criminal charges; (3) Fisher's status as the object of an Eastern District grand jury's investigation into Eliahu's flight; and (4) Fisher's status as a possible witness concerning statements made during the plea negotiations on behalf of Eliahu. Through a series of letters and statements to the District Court, the Government requested that the Court at least engage Levy in a colloquy to determine if he was willing to waive his right to a non-conflicted lawyer.

From the outset, Judge McLaughlin, to whom the case was then assigned, was concerned about the conflicts identified by the Government, and in the course of various hearings the Court questioned Fisher about these matters. During a November 6, 1989, hearing, Fisher stated that he had already discussed with Levy each of the conflict issues raised by the Government except for the problem posed by the lawyer's status as a possible witness. Fisher claimed that this last concern did not genuinely present a conflict problem because the statements made during Eliahu's plea negotiations were not likely to become an issue during Levy's trial, and because Fisher's co-counsel could take over Levy's defense if by some chance they did.

Recognizing the problems precipitated by Fisher's representation of Levy and not fully reassured by Fisher's attempt to diffuse these problems, Judge McLaughlin wisely suggested that Fisher let his co-counsel take over Levy's defense. Fisher resisted this suggestion, claiming that Levy strongly desired his services. Judge McLaughlin then suggested that Fisher at least cease his representation of Eliahu and was apparently satisfied by Fisher's statement that "[i]n the event that [Eliahu] is brought back here I represent I will not represent him." Though recognizing that there were other conflict problems, Judge McLaughlin stated that he was not prepared at that time to engage Levy in a full colloquy to determine if he was willing to waive his right to a non-conflicted lawyer. Judge McLaughlin recommended that the Government make a formal motion to put in issue these other conflicts.

A December 15, 1989, hearing focussed primarily on the conflict raised by Fisher's status as a potential witness concerning statements made during Eliahu's plea negotiations. By this point, the Government had conceded that these statements could be introduced at trial only to rebut or impeach Levy if he testified. That concession led Fisher to claim that there was no conflict at all because Levy was not going to testify at trial. Judge McLaughlin was disturbed by Fisher's assertion that Levy was willing to forgo his right to testify at trial in order to retain Fisher as his attorney. The hearing concluded with the parties agreeing to further brief this issue for the Court.

By this stage, the Government had still not made a motion to disqualify Fisher. However, in a lengthy letter to the District Court dated January 5, 1990, the Government urged Fisher's disqualification. The letter outlined all four of the problems that the Government believed necessitated Fisher's removal and concluded that "the totality of all four conflicts of interest converge and combine to present an irrefutable necessity to disqualify" Fisher.

Treating the Government's letter as a motion, Fisher replied in a January 10, 1990, letter to the District Court that "the letter motion seeking my disqualification should be denied." Fisher claimed that (1) Levy had explicitly waived any conflict arising from his

"prior representation of Eliahu," [2] (2) any conflict from his prosecution on unrelated criminal charges "had been resolved in open Court during a prior proceeding," [3] and (3) his status as a potential rebuttal witness was of no consequence because the statements the Government sought to elicit from him were inadmissible and, in any event, Levy would not testify concerning these matters. Fisher did not respond to the conflict alleged to arise from his being a target of grand jury inquiry concerning Eliahu's flight.

During a brief status conference before Judge McLaughlin on January 11, 1990, Fisher asserted his view that the conflicts issues had been "honed down" to a dispute over the possible use in Levy's trial of statements made during Eliahu's plea negotiations. Judge McLaughlin inquired as to the other conflict problems stemming from Fisher's "own situation." Fisher stated: "That has been waived, Your Honor. The defendant and the court had a colloquy.... On the record, that's been waived." Though the District Court accepted this representation, in fact there had not been any colloquy between Levy and the Court concerning Fisher's conflicts, nor was there evidence of any sort of waiver on the record. The Government did not directly challenge Fisher's claim of a waiver, but it did mention its January 5 letter suggesting that Fisher's multiple conflicts precluded any effective waiver from Levy and thus necessitated Fisher's disqualification. This discussion concluded with both parties asserting that they would further consider these points in motion papers, but in fact there was no further briefing of the conflict issues.

In part because a motion to dismiss was still pending, Judge McLaughlin did not rule concerning Fisher's disqualification before being elevated to the Court of Appeals. Levy's case was reassigned to Judge Glasser in October 1990. At a November 19, 1990, hearing, after Judge Glasser ruled on the motion to dismiss, the Government highlight-ed that conflict issues were still unresolved. As to the joint representation problem, Judge Glasser expressed the view that this was not a problem because Eliahu was a fugitive and the Government had no intention to try him in his absence. Judge Glasser then explained that he was not fully aware of the other conflict issues. In response, Fisher stated that he wanted to consult with Levy to insure that Levy still sought Fisher's representation now that the motion to dismiss had been decided. The parties agreed to re-brief the conflict issues for Judge Glasser, and they forwarded to the Judge copies of all the prior correspondence concerning these issues. Unfortunately, Judge Glasser also did not have the opportunity to rule on these matters before further re-assignment of the case to Judge Weinstein.

Judge Weinstein apparently was not fully apprised of the conflict issues prior to Levy's trial, which began without any colloquy between Levy and the Court concerning Fisher's role as defense counsel. Fisher served as Levy's lawyer throughout the trial that transpired in February of 1992. At times during trial, Levy complained to the District Court about Fisher's representation, and Fisher at various points moved to be dismissed. At one point toward the end of the trial, Levy made a lengthy statement to the District Court complaining about Fisher. In response, Judge Weinstein repeatedly asked Levy if he was making a motion to disqualify his counsel, but Levy said that he was unsure how to reply. Fisher then made a motion to be relieved, which was denied by Judge Weinstein. Levy was ultimately convicted on all five drug counts submitted to the jury. Levy, Fisher, and the District Court agreed on Fisher's dismissal as Levy's counsel at the conclusion of the trial, and new counsel was appointed for post-trial motions.

With the conflict issues brought into focus by new counsel, Judge Weinstein conducted post-trial hearings and ultimately ruled that

2. Whether Fisher continued to represent Eliahu at and after this point is unclear. The Government's letter to the Court suggested that Fisher was still representing Eliahu, but Fisher, in reply, referred to his "prior" representation of Eliahu. During post-trial hearings before Judge Weinstein, Fisher admitted that he never formally withdrew as counsel for Eliahu.

3. Levy and the Government agree that there is no evidence of any prior proceeding in which this particular conflict issue was in fact resolved.

the alleged conflicts did not justify a new trial. He suggested there may have been a technical violation of Fed.R.Crim.P. 44(c)—which calls upon the District Court to advise a defendant who is being jointly represented with a co-defendant—because Fisher never formally withdrew from representing Eliahu and the Court never directly addressed Levy. However, Judge Weinstein, clearly influenced by the fact that Eliahu had fled to Israel before Levy had been brought to the United States, found any error harmless since "[n]o disadvantage at any time resulted to defendant because Mr. Fisher in form, but not in fact, had previously represented Eliahu." Judge Weinstein also implied that Levy adequately waived any conflicts arising from Fisher's other problems. The Judge found that Fisher had fully informed Levy of the issues raised in the Government's January 5, 1990, letter to the Court, that Fisher had explained to Levy that he was entitled to another attorney, and that Levy nevertheless had "insisted on Mr. Fisher, and no other lawyer, representing him."

## Discussion

### I. Ineffective Assistance of Counsel Due to Conflicts of Interest

The right to counsel under the Sixth Amendment entails "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). As we have explained in recent opinions, a defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance. *See Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) (citing *Strickland v. Washington*, 466 U.S 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), *cert. denied*, — U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994); *United States v. Fulton*, 5 F.3d 605, 609 (2d Cir.1993).

Unfortunately, despite the Government's repeated warnings about the problems stemming from Fisher's representation of Levy, the District Court did not fully explore and resolve Fisher's conflicts of interest before Levy's trial and conviction. Thus, on appeal, we must try to ascertain whether Fisher labored under actual or potential conflicts of interest and try to reconstruct whether such conflicts prejudiced Levy, adversely affected Fisher's performance, or were of no consequence whatsoever. A clear feature of this case is that the repeated reassignment of the case resulted in a failure to follow the procedures this Court set forth in *United States v. Curcio*, 680 F.2d 881 (2d Cir.1982), procedures that might have resulted in a knowing and intelligent waiver from Levy of his right to a non-conflicted lawyer. Yet, because the legal consequences of this failure are not entirely clear, resolving Levy's Sixth Amendment claim of ineffective assistance of counsel remains an intricate task.

We begin by noting that the Government's role in generating the issues now before us is a mixed one. To its credit, the Government diligently alerted the District Court to the various problems arising from Fisher's representation of Levy and astutely suggested that the Court "resolve these conflicts of interest at [an] early stage before Mr. Fisher's representation of Chaim Levy develops into a 'mine field' for the Court." However, when the case was reassigned to Judge Weinstein, the Government neglected to apprise him of these concerns, thereby permitting the Judge to walk unwittingly into the "mine field." To determine whether the consequences require a retrial, we turn to the nature of the District Court's obligations.

### A. District Court's Obligations

Levy contends that the District Court's failure to follow the *Curcio* procedure alone *requires* a reversal of his conviction. For support, Levy cites the Supreme Court's statement in *Wood v. Georgia* that "*Sullivan* mandates a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" 450 U.S. at 272 n. 18, 101 S.Ct. at 1104 n. 18 (quoting and

citing *Cuyler v. Sullivan*, 446 U.S. at 347, 100 S.Ct. at 1717–18). By making this claim, however, Levy confuses two distinct obligations placed on a district court when the specter of conflicts of interest arises.

■ 1. *"Inquiry" obligation.* When a district court is sufficiently apprised of even the possibility of a conflict of interest, the court first has an "inquiry" obligation. *See Wood*, 450 U.S. at 272–73, 101 S.Ct. at 1103–04; *Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1717–18; *Holloway*, 435 U.S. at 484, 98 S.Ct. at 1178–79. The court must investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all. *See Strouse v. Leonardo*, 928 F.2d 548, 555 (2d Cir.1991) ("In order to protect a defendant's right to conflict-free counsel, the trial court must initiate an inquiry when it knows or reasonably should know of the possibility of a conflict of interest."); *see also United States v. Aiello*, 814 F.2d 109, 113 (2d Cir.1987) (Sixth Amendment "imposes a duty upon a trial court to inquire").

■ 2. *"Disqualification/waiver" obligation.* Whenever the court's inquiry reveals that a criminal defendant's attorney in fact suffers from an actual or potential conflict, the court has a subsequent "disqualification/waiver" obligation. If the court discovers that the attorney suffers from a severe conflict—such that no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation—the court is obliged to disqualify the attorney, *see Fulton*, 5 F.3d at 612–14. If the court discovers that the attorney suffers from a lesser or only a potential conflict—such that a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation—the court should follow the procedures set out in *Curcio*, 680 F.2d at 888–90, in order to obtain directly from the defendant a valid waiver of his right to a non-conflicted lawyer, *see United States v. Iorizzo*, 786 F.2d 52, 58–59 (2d Cir.1986).[4] If the court's inquiry reveals that there is no genuine conflict at all, the court has no further obligation.

■ These obligations, which stem from the Sixth Amendment, arise whenever there is the possibility that a criminal defendant's attorney suffers from any sort of conflict of interest.[5] They exist because trial courts have an "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment." *Wheat v. United States*, 486 U.S. 153, 161, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988).[6]

■ 3. *Automatic Reversal Rule.* When a possible conflict has been entirely ignored, reversal is automatic.[7] *Cuyler*, 446

---

**4.** We summarized these procedures in *Iorizzo*:

[T]he trial court should: (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

*Iorizzo*, 786 F.2d at 59 (citing *Curcio*, 680 F.2d at 888–90).

**5.** Some have questioned whether the Supreme Court's conflicts-of-interest doctrine, much of which developed in the context of joint-representation conflicts, is applicable in all conflicts contexts. *See, e.g., Beets v. Collins*, 986 F.2d 1478, 1483–84 (5th Cir.) (discussing the universal applicability of the Supreme Court's decision in *Cuyler*), *reh'g en banc granted*, 998 F.2d 253 (5th Cir.1993). This Circuit, however, has not questioned the universal applicability of the Supreme Court's conflicts precepts and has consistently

applied the same basic doctrine in all conflict-of-interest situations. *See Fulton*, 5 F.3d at 609.

**6.** Because "a possible conflict inheres in almost every instance of multiple representation," *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718, Rule 44(c) of the Federal Rules of Criminal Procedure explicitly imposes the same basic obligations upon the trial court whenever co-defendants are represented by the same counsel. *See* Fed.R.Crim.P. 44(c) ("[T]he court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to effective assistance of counsel, including separate representation, ... [and] shall take such measures as may be appropriate to protect each defendant's right to counsel.").

**7.** There are two related, though perhaps distinct, grounds for concluding that such an error requires reversal. The district court's failure could itself be considered an independent constitutional violation that alone necessitates reversal. *See Hamilton v. Ford*, 969 F.2d 1006, 1011 (11th

U.S. at 347, 100 S.Ct. at 1717–18; *Holloway*, 435 U.S. at 488, 98 S.Ct. at 1180–81. The automatic reversal rule applies only when a district court has failed to fulfill its initial "inquiry" obligation. *See Strouse*, 928 F.2d at 555. As the Tenth Circuit has explained: "The Sixth Amendment requires automatic reversal only when a trial court fails to conduct an inquiry after either a timely conflict objection, *Holloway*, 435 U.S. at 488 [98 S.Ct. at 1180] or if the court 'knows or reasonably should know a particular conflict exists.' *Cuyler*, 446 U.S. at 347 [100 S.Ct. at 1717]." *United States v. Burney*, 756 F.2d 787, 791 (10th Cir.1985); *see also Hamilton v. Ford*, 969 F.2d 1006, 1011–12 (11th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993); *United States v. Crespo de Llano*, 838 F.2d 1006, 1012 (9th Cir.1987); *United States v. Cirrincione*, 780 F.2d 620, 625 (7th Cir.1985).

 In this case, we conclude that the District Court fulfilled its initial inquiry obligation, and therefore reversal is not automatic. The District Court did not ignore the conflict issues once they came to the Court's attention. In fact, the District Court repeatedly investigated Fisher's possible conflicts. Judge McLaughlin conducted extended colloquies with Fisher about the conflicts asserted by the Government during the hearings of November 6 and December 15, 1989, and January 11, 1990. Unfortunately, at each of these hearings, Fisher distorted the true nature of his interests and incorrectly assured the District Court that he did not suffer from any actual conflicts. At one point, Fisher even falsely represented that Levy had made an effective waiver of certain conflicts in open court.

The facts here are similar to those confronted by the Ninth Circuit in *United States v. Crespo de Llano*, 838 F.2d 1006 (9th Cir. 1987). In *Crespo de Llano*, the Government

alerted the trial court to a possible conflict presented by defense counsel's joint representation of co-defendants. The trial court asked the defense counsel if the situation presented a risk of conflict, and the attorney assured the court that he had fully discussed this issue with his clients and he did not see any conflict. On the basis of the counsel's representations, the trial court took no further steps to explore the conflict problem. *See id.* at 1012. The Court of Appeals held that the trial court's inquiry was constitutionally sufficient because the court was entitled to rely on the attorney's representation that no conflict existed. *See id.* at 1012–13.

We similarly find that the District Court's inquiry of Fisher and its reliance, albeit misplaced, on Fisher's repeated representations concerning his possible conflicts of interest were sufficient to satisfy the Court's inquiry obligation. This case does not involve a district court's turning a blind eye to an obvious possible conflict. Clearly troubled by Fisher's conflicts, Judge McLaughlin questioned him repeatedly about his conflicts and even suggested that he discontinue his representation of Levy. Because the facts here reveal that the District Court took seriously its "independent duty" to ensure that Levy received a fair trial, this is not an appropriate case to apply the automatic reversal rule.

 Nevertheless, once the case was reassigned from Judge McLaughlin, the subsequent judges did not fulfill the District Court's "disqualification/waiver" obligation and thus a reversal of Levy's conviction might still be necessary. Even if fully satisfied by Fisher's assurances that there were no significant conflict-of-interest problems, the District Court still should have recognized that Fisher's various entanglements presented at least potential conflicts of interest. The Court was thus obligated at the

Cir.1992) (reversal automatic when there is no inquiry because "the trial court has failed to discharge its constitutional duty under *Holloway* to determine whether the defendants are receiving adequate assistance of counsel, a duty separate from the *Cuyler* framework."), *cert. denied*, —— U.S. ——, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993). Alternatively, the absence of an inquiry by the district court, and thus the absence of any account or record of the true nature of the

alleged conflict, may require a presumption of the prejudice that a defendant must usually demonstrate to make out a claim of ineffective assistance of counsel. *See United States v. Marrera*, 768 F.2d 201, 205 (7th Cir.1985) (when "trial court fails to inquire into [an alleged] conflict, a reviewing court will presume prejudice upon a showing of possible prejudice"), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986).

very least to engage Levy personally in a colloquy to determine if he was willing to waive his right to a conflict-free lawyer. Had the District Court followed the procedures set forth in *Curcio, see* 680 F.2d at 888–90, and obtained a waiver from Levy, on review we would need to examine only whether the nature of Fisher's conflicts were such that Levy's waiver could be considered effective. *See Fulton,* 5 F.3d at 612–14 (examining whether defendant's explicit, in-court waiver of his right to conflict-free counsel was valid in light of the character of his attorney's conflicts). However, the absence of any clear, on-the-record waiver requires us to determine whether Fisher's alleged conflicts denied Levy the effective assistance of counsel.

## B. Nature of Fisher's Conflicts and Their Impact

To determine whether Levy was denied the effective assistance of counsel in violation of the Sixth Amendment, we must explore whether Fisher labored under actual or merely potential conflicts of interest and whether such conflicts prejudiced Levy, adversely affected Fisher's performance, or were of no consequence at all. These are the crucial inquiries because, as we recently explained:

> [u]nder *Strickland v. Washington,* 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), if a defendant establishes that her attorney has a potential conflict of interest, in order to prove that the conflict resulted in a violation of her Sixth Amendment right to effective assistance of counsel, she must demonstrate prejudice. However, prejudice is presumed when a defendant establishes that her attorney had an actual conflict of interest that adversely affected the attorney's performance.

*Winkler,* 7 F.3d at 307.

The Government repeatedly asserts that Fisher suffered at most from a series of *potential* conflicts. The Government further suggests that none of these potential conflicts ripened into an actual conflict for the following reasons: (1) the joint representation conflict was of no consequence once Eliahu fled to Israel; (2) Fisher's status as a possible witness was of no consequence since the Government conceded that it would not use his testimony as direct evidence, and it never had occasion to use it in rebuttal; (3) Fisher's status as a suspect in Eliahu's flight was of no consequence since that investigation was never pursued; and (4) Fisher's status as a defendant in unrelated criminal proceedings was of no consequence since the charges were resolved before Levy's trial. By stressing Judge Weinstein's finding that Levy received able representation and by defending Fisher's trial conduct, the Government also endeavors to show that no prejudice came to Levy from Fisher's potential conflicts.

In sharp contrast, Levy argues that Fisher labored under actual conflicts of interest and that these conflicts significantly affected Fisher's representation and prejudiced Levy. Levy highlights that when the Government initially sought to disqualify Fisher before trial, it spoke of Fisher's "actual" and "multiple" conflicts and it claimed that these conflicts had already compromised Fisher's performance. Speculating about various alternative defense tactics that Fisher could have employed, Levy contends that Fisher's "conflicts influenced every stage of the process, from pre-trial strategy ... to direct and cross-examination decisions at trial...."

1. *Actual or Potential Conflict?* In *Winkler,* we explained the nature of the distinction between actual and potential conflicts: "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" 7 F.3d at 307 (quoting *Cuyler,* 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3). Significantly, the District Court's failure to completely explore and resolve Fisher's possible conflicts leaves us with an incomplete record that makes it difficult to pinpoint if, or precisely when, the interests of Fisher and Levy may have diverged. Nevertheless, though we cannot easily determine exactly when Fisher's difficulties became actual conflicts, the very nature of Fisher's predicaments strongly indicates that he labored under actual, and not merely potential, conflicts of interest. In

fact, precedents from this and other circuits suggest that each of Fisher's alleged conflicts amounted to an actual conflict.

■ As for the joint representation conflict, though Fisher may have represented Eliahu only "in form, but not in fact" once he fled to Israel, Fisher never formally withdrew as Eliahu's representative. Moreover, even if Fisher had fully terminated his representation of Eliahu prior to serving as Levy's counsel, Fisher still possessed privileged information from his relationship with Eliahu that was directly relevant to Levy's defense. Fisher's continuing legal and ethical obligations to protect Eliahu and his confidences necessarily meant that Fisher's interests diverged from Levy's, especially since Levy's most likely defense was to shift blame to Eliahu. *Cf. Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir.) (finding actual conflict when defense theory was centered on accusations against attorney's former client), *cert. denied*, 493 U.S. 872, 110 S.Ct. 203, 107 L.Ed.2d 156 (1989); *Church v. Sullivan*, 942 F.2d 1501, 1510–11 (10th Cir.1991) (making same finding and noting that it is "difficult to envision circumstances more fraught with inherent conflict than where [a lawyer] ... must present a defense theory inculpating [his] former client, particularly where the former representation was factually intertwined with the criminal defendant's case").

Similarly, even though Fisher never ultimately testified at Levy's trial concerning statements made during Eliahu's plea negotiations, he had a personal interest to avoid even the possibility of being called as a witness, especially since he very likely would have had to cease representing Levy if required to testify. Indeed, Fisher's colloquies with the District Court revealed that his desire to avoid being called as a witness made him willing to sacrifice or compromise certain trial strategies and defenses. *Cf. United States v. Miskinis*, 966 F.2d 1263, 1269 (9th Cir.1992) (noting that if attorney's potential testimony "would have been adverse to a defense that [defendant] might have offered, a conflict of interest existed").

Fisher's prosecution on unrelated criminal charges by the same office prosecuting Levy presents further conflict concerns. Fisher may have believed he had an interest in tempering his defense of Levy in order to curry favor with the prosecution, perhaps fearing that a spirited defense of Levy would prompt the Government to pursue the case against Fisher with greater vigor. *Cf. United States v. McLain*, 823 F.2d 1457, 1463–64 (11th Cir.1987) (finding actual conflict when defendant's counsel under investigation for bribery by same U.S. Attorney's Office prosecuting defendant); *Thompkins v. Cohen*, 965 F.2d 330, 332 (7th Cir.1992) (noting that a conflict can arise when a defendant's lawyer is himself involved in separate criminal investigation by the same prosecutor's office). Though Fisher was sentenced before Levy's trial began, the pendency of the charges against Fisher created a conflict for the lawyer in properly representing Levy during the pretrial stage of Levy's case, as the Government noted in its January 5, 1990, letter.

Last, but certainly not least, perhaps the most troubling conflict concerns Fisher's undetermined role in Eliahu's flight. If Fisher's behavior with regard to Eliahu was even slightly questionable, he would obviously have a strong personal interest, distinct from Levy's interests, in avoiding any exploration of Eliahu's activities. Many courts have found an actual conflict of interest when a defendant's lawyer faces possible criminal charges or significant disciplinary consequences as a result of questionable behavior related to his representation of the defendant. *See, e.g., United States v. Greig*, 967 F.2d 1018, 1022 (5th Cir.1992) (actual conflict when attorney implicated in obstructing justice to aid defendant); *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 136 (3d Cir. 1984) (actual conflict when attorney involved in the destruction of evidence in defendant's case); *United States v. White*, 706 F.2d 506, 507–08 (5th Cir.1983) (actual conflict when attorneys being investigated concerning prior escape of defendant); *see also Fulton*, 5 F.3d at 609–10 ("when 'an attorney is accused of crimes similar or related to those of his client, an actual conflict exists because the potential for diminished effectiveness in representation is so great.'" (quoting *Mannhalt v. Reed*, 847 F.2d 576, 581 (9th Cir.), *cert.*

*denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 249 (1988))). Though in this instance, Fisher's alleged wrongdoing was in connection with his representation of Eliahu, the links between Levy, Eliahu, and Fisher were such that the same conflict concerns in the cases just cited are implicated here, *i.e.* fearing answers that might incriminate himself, the defendant's attorney would have a strong personal desire to refrain from inquiring at the defendant's trial into certain matters that were directly relevant to, and potentially exculpatory of, his client.

Even if we could overlook any one ground of conflict, the myriad connections between Fisher, Levy, and Eliahu oblige us to consider Fisher's conflicts together. Doing so, we can reasonably conclude that Fisher's interests were never congruent with Levy's, certainly not with respect to all material issues and tactics. Fisher labored under actual conflicts of interest during the course of his representation of Levy.

 2. *Adverse effect.* To prevail on his Sixth Amendment claim, Levy must demonstrate that Fisher's actual conflicts adversely affected Fisher's performance. *See Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719.[8] In *Winkler,* this Court adopted the test of adverse effect applied in the First and Third Circuits. *See* 7 F.3d at 309. The test requires a defendant to demonstrate that some "plausible alternative defense strategy or tactic might have been pursued," and that the "alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* (internal quotations and citations omitted).

Neither Levy nor the Government endeavors to invoke the *Winkler* standard directly. Nevertheless, among other claims regarding the impact of Fisher's conflicts, Levy suggests that one plausible alternative defense strategy would have been to try to pin greater culpability on Eliahu. Levy further intimates that Fisher did not pursue this strategy because Fisher still had a lawyer's obligation to Eliahu as his client and because Fisher did not want to expose himself to prosecution for his role in Eliahu's flight. In response, the Government simply stresses Judge Weinstein's general conclusion that Fisher's representation "was professionally correct and was as skillful as any attorney's conduct of the defense could have been."

Significantly, when initially seeking to have Fisher disqualified before trial, the Government portrayed the strategy of casting blame upon Eliahu as Levy's "best defense." As the Government itself noted, it was Eliahu who engaged in direct narcotics sales to the Government's informant, whereas Levy was not even in the United States at the time of the illegal acts that served as the basis for the charges against him. In this context, an attempt to portray Eliahu as the primary offender in the underlying criminal activity would certainly have to qualify as a "plausible alternative defense strategy" for Levy. *See Winkler,* 7 F.3d at 309 (noting that a suggested alternative defense approach need only be a "viable alternative").

 Further, as Levy suggests, we can properly conclude that Fisher did not undertake this alternative strategy because of his various conflicts. In fact, three of Fisher's four difficulties bear directly upon his inclination to pursue this defense strategy. A complete exploration of Eliahu's role in the underlying drug offenses would force Fisher to risk (1) breaching his legal and ethical obligations to Eliahu as his client, (2) uncovering

---

8. In limited circumstances, this Court applies a *per se* rule, relieving the defendant of the obligation to show that the attorney's conflicts had adverse effects on the attorney's performance. *See, e.g., Strouse,* 928 F.2d at 555; *Bellamy v. Cogdell,* 974 F.2d 302, 306–07 (2d Cir.1992) (in banc), *cert. denied,* — U.S. ——, 113 S.Ct. 1383, 122 L.Ed.2d 759 (1993). Levy contends that his case comes within the *per se* rule because of Fisher's alleged involvement in Eliahu's flight. However, we have repeatedly stressed the limited reach of the *per se* rule, emphasizing that it applies only when a defendant's lawyer was unli-

censed or had engaged in the defendant's crimes. *See Winkler,* 7 F.3d at 308; *Bellamy,* 974 F.2d at 306–07. Here, Fisher's alleged wrongdoing, though arising in the wake of criminal activity allegedly involving Levy, involves a completely different substantive crime and is factually and temporally distinct from Levy's alleged criminal acts. In this context, the *per se* rule is inapplicable. *See Fulton,* 5 F.3d at 611 (noting that *per se* rule is applicable only if attorney's criminal activity is closely related to charged crimes of defendant).

his own possible misconduct from his role in Eliahu's flight, and (3) exposing himself to being called as a witness during Levy's trial. On these facts, Levy can thus establish that the plausible alternative defense strategy of shifting primary criminal responsibility upon Eliahu was "inherently in conflict with or not undertaken due to [Fisher's] other loyalties or interests." *Winkler*, 7 F.3d at 309. Indeed, beyond implausibly suggesting that such matters were "irrelevant to Levy's guilt," the Government has not provided any reason why Fisher did not explore Eliahu's role in the offense and portray him as the culprit because of his flight. This case is unlike *Winkler*, where there were justifiable reasons other than the attorney's conflicts that better explained why alternative defense strategies were not pursued. *See id.* at 309–10. In sum, by sufficiently showing that Fisher's conflicts prompted him to forgo a viable line of defense, Levy has sufficiently demonstrated an adverse effect upon Fisher's representation to establish a Sixth Amendment violation. *See United States v. Cancilla*, 725 F.2d 867, 871 (2d Cir.1984) (finding adverse effect in representation when conflicted attorney "backed off from pursuing" a particular defense).[9]

██ 3. *Waiver.* In reaching his post-trial conclusion that Fisher's conflicts of interest did not justify a new trial, Judge Weinstein essentially relied on a theory of waiver and asserted that Levy was fully informed at all times of Fisher's potential or actual conflicts. However, there are no findings that would support a conclusion that Levy knowingly and intelligently waived his constitutional right to a lawyer unburdened by conflicts of interest, and no basis in the record for making such findings.

In numerous cases, we have repeatedly emphasized the trial court's central role in apprising a defendant of his lawyer's conflicts in order to obtain an effective waiver, *see,*

*e.g., United States v. Rodriguez*, 968 F.2d 130, 138–39 (2d Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992); *Williams v. Meachum*, 948 F.2d 863, 866–67 (2d Cir.1991); *Iorizzo*, 786 F.2d at 59; *Curcio*, 680 F.2d at 888–90. Here, however, the record clearly reveals that none of the judges to whom this case was assigned ever addressed Levy concerning his counsel's conflicts, and there is no evidence of any court proceeding even resembling the procedures laid out in *Curcio*. Judge Weinstein was apparently satisfied that *Fisher* had informed Levy. of his conflicts and had adequately determined that Levy wished his continued representation. Yet we have cautioned about leaving the waiver inquiry in the hands of "the very attorney whose capacity to act in the defendant's interests [is] under challenge." *Iorizzo*, 786 F.2d at 59. Furthermore, the evidence does not clearly establish that Fisher ever fully apprised Levy of the nature of his conflicts or their potential impact. Indeed, since Fisher misrepresented one aspect of his conflicts to the District Court at various times, we can hardly assume that Fisher properly detailed for Levy the facts, much less the implications, of his multiple conflicts.

This Court has repeatedly concluded that even a defendant's explicit, in-court waiver of his right to a non-conflicted lawyer was not valid and effective when the trial court failed to explain adequately the ramifications of the attorney's conflicts and failed to provide the defendant with time to reflect on his decision. *See, e.g., United States v. Edwardo-Franco*, 885 F.2d 1002, 1006–07 (2d Cir.1989); *Iorizzo*, 786 F.2d at 59; *see also United States v. Friedman*, 854 F.2d 535, 574 (2d Cir.1988) (emphasizing that "departures from the procedures outlined in *Curcio* and *Iorizzo* may be justified only in unusual circumstances"), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). To find an effective

---

9. We note that during the course of the trial, Levy himself complained about the manner in which Fisher was representing him. In a significant outburst toward the end of the trial, Levy made a lengthy statement to the District Court in which he stated his belief that Fisher's representation had been affected by Fisher's personal interests. Though a defendant's complaints about an attorney's actions cannot necessarily substantiate the "lapse in representation," *Cuyler*, 446 U.S. at 349, 100 S.Ct. at 1719, needed to establish adverse effect, Levy's complaints during trial serve in this case to confirm our view that Fisher's representation was adversely impacted by the range of conflicts under which he labored.

waiver of Levy's Sixth Amendment right to a non-conflicted lawyer on this record—where the evidence suggests that Levy did not know about or fully understand the true nature of his attorney's conflicts—would eviscerate this Circuit's strict waiver requirements.

## II. Levy's Arrest and Extradition from Egypt

Levy argues that the circumstances surrounding his arrest and extradition from Egypt justify dismissal of the charges upon which he was convicted. As part of his arguments, Levy makes a range of allegations concerning the behavior of Government agents in procuring his arrest and extradition. In particular, Levy claims that (1) the warrant of extradition issued by the United States falsely stated that he was wanted for murder, and (2) he was initially extradited on the basis of an arrest warrant that contained one conspiracy count, but he was tried and convicted on a five count indictment.

Levy makes two legal claims based on these allegations. Relying on *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974), he claims that the totality of the Government's conduct in bringing him to trial was so egregious that his prosecution violates due process limitations. Levy further claims that the "Rule of Specialty"—a principle of international law that prohibits a defendant from being tried on charges other than those for which he was extradited—was violated by his trial on the five counts in his indictment rather than just the one count in his arrest warrant.

 Judge Glasser rejected these claims while he presided over this case, and we find no error in his conclusions. First, Levy has not adequately demonstrated that any aspect of the Government's conduct in this case was improper, let alone so egregious as to violate due process and mandate dismissing the charges against him. In *Toscanino* the defendant alleged that Government agents forcibly abducted and tortured him in a shocking manner, *see* 500 F.2d at 269–71, whereas here Levy can only suggest that agents may have made misrepresentations to Egyptian authorities to prompt Levy's arrest and ex-

tradition. Moreover, the alleged misrepresentations do not even relate to the narcotics charges for which Levy was arrested and extradited. As Judge Glasser properly held, Levy's claims of Government misconduct do not nearly approach the sort of allegations in *Toscanino* that prompted this Court to suggest that the Government's behavior might bar prosecution.

 Second, the documentary evidence concerning Levy's extradition suggests that Levy in fact was extradited for the charges on which he was tried. Though Levy assails the document on various grounds, there is a diplomatic note from the Egyptian Ministry of Foreign Affairs that states that Levy was extradited to be tried on the charges of his indictment. Levy fails to present any reasonable grounds for ignoring this official communication, which provides an adequate basis for Levy's trial on all five charges upon which he was convicted. Further, even if we were to conclude that Levy was extradited on the basis of the one narcotics conspiracy charge in his initial arrest warrant, the Rule of Specialty would still not have been violated by his subsequent trial on the five drug counts in his indictment. On quite similar facts, we have held that the Rule of Specialty was not violated when a defendant, extradited on a narcotics conspiracy charge, was tried on additional drug trafficking charges because the defendant was not actually tried on separate offenses. *See United States v. Paroutian*, 299 F.2d 486, 490–91 (2d Cir.1962); *see also United States v. Rossi*, 545 F.2d 814, 815 (2d Cir.1976) (no violation of the Rule of Specialty when superseding indictment underlying conviction involved same basic offenses), *cert. denied*, 430 U.S. 907, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977); *Fiocconi v. Attorney General of the United States*, 462 F.2d 475, 480–82 (2d Cir.) (no Rule of Specialty violation when defendants prosecuted "for subsequent offenses of the same character as the crime for which they were extradited"), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972).

## III. Conclusion

Most of Levy's other claims of error are mooted by our decision to reverse his convic-

tion and remand for a new trial based on the violation of his Sixth Amendment right to effective assistance of counsel. Beyond the issues discussed in this opinion, we express no view concerning the merits of Levy's other claims of error related to his trial and sentence.

We have considered Levy's remaining contentions that might potentially provide grounds for additional relief and find them to be without merit. The speedy trial claim was properly rejected for reasons fully discussed in Judge Glasser's opinion.

Reversed and remanded.