**UNITED STATES of America**

v.

**Wlodek Jan LECH.**

**No. S2 94 Cr. 285 (SS).**

United States District Court,
S.D. New York.

Aug. 4, 1995.

---

Mary Jo White, United States Attorney, Southern District of New York (Jonathan N. Halpern, Assistant United States Attorney, of counsel), New York City, for plaintiff.

Leonard F. Joy, The Legal Aid Society, Federal Defender Div. (Andrew H. Schapiro, Associate Attorney, of counsel), Gerald J. McMahon, New York City, for defendant.

Albert A. Gaudelli, Forest Hills, NY, for Joseph Tantillo.

## OPINION AND ORDER

SOTOMAYOR, District Judge.

The motion before me is the result of a disturbing oversight by the United States Attorney's Office for the Southern District of New York. On the eve of trial, defendant's counsel, a member of the Southern District of New York Federal Defender Division, received materials produced pursuant to 18 U.S.C. § 3500. These materials revealed that a cooperating witness whom the government intends to use at trial was formerly represented by another member of the Southern District Federal Defender Division. Defendant Wlodek Jan Lech ("Lech") now moves for sanctions, barring the government from using the cooperating witness's testimony at trial. For the reasons discussed below, the motion is denied.

### Background

Lech, Carmine Russo ("Russo"), and Henry Fulton ("Fulton") were named in a multicount indictment charging them with conspiracy and bribery in connection with an asbestos removal project at Julia Richman High School in Manhattan (the "Julia Richman Asbestos Removal Scheme"). Because the indictment charged Fulton and Russo with other crimes including conspiracy, bribery and mail fraud in connection with a New York City Board of Education ("BOE") project located at 402 Eastern Parkway in Brooklyn (the "402 Eastern Parkway Project"), I severed Lech's trial pursuant to Federal Rule of Criminal Procedure 8(b). See Opinion and Order of the Court, published at 161 F.R.D. 255 (S.D.N.Y.1995). Following a six week trial, a jury convicted Fulton of the counts related to the 402 Eastern Parkway Project, and acquitted him on all counts related to the Julia Richman Asbestos Removal Scheme.[1] Lech's trial was scheduled to begin on July 31, 1995, less than one week after the jury's verdict in the Fulton trial.

At Fulton's trial, the government elicited testimony from a cooperating witness, Joseph Tantillo ("Tantillo"), who was a BOE official. Tantillo became a cooperating wit-

ness as a result of an agreement he entered into with the United States Attorney's Office on December 10, 1992 (the "Cooperation Agreement"). See Cooperation Agreement, attached as Ex. A to First Letter to the Court of Andrew H. Schapiro, dated July 28, 1995 (the "July 28 Letter"). The terms of the Cooperation Agreement were negotiated by a prosecutor who is no longer with the United States Attorney's Office, and Tantillo's then lawyer, John P. Curley ("Curley") of the Southern District of New York Federal Defender Division of the Legal Aid Society (the "Federal Defender Division"). Both Curley and Tantillo signed the Cooperation Agreement. Id. Sometime after entering into the Cooperation Agreement, Tantillo relieved Curley in favor of a privately retained attorney, Albert Gaudelli ("Gaudelli"). Gaudelli represented Tantillo at his plea allocution before Judge Peter K. Leisure on April 13, 1993. Gaudelli continues to represent Tantillo.

Since the date of his arrest, May 19, 1994, Lech has been represented by Andrew H. Schapiro ("Schapiro"), an attorney with the Federal Defender Division. This is the same office that represented Tantillo when the Cooperation Agreement was signed. Curley, in fact, is now a senior trial attorney in that office. Schapiro discovered this possible conflict of interest on July 27, 1995, over one year after he began representing Lech and just four days before Lech's trial was to begin, when the government produced the Cooperation Agreement pursuant to 18 U.S.C. § 3500. Although the first page of the Cooperation Agreement lists Curley's name, address, and affiliation with the Federal Defender Division, it did not occur to the government that a possible conflict of interest existed. This failure to recognize the conflict is even more astonishing considering that the government introduced the Cooperation Agreement as an exhibit at Fulton's trial and produced 3500 materials noting Curley's presence as Tantillo's attorney at various meetings.

Immediately upon reviewing the Cooperation Agreement on July 27, Schapiro advised the Court of the conflict and a preliminary

---

1. Fulton was tried alone because Russo passed away shortly before trial.

conference was held later that afternoon. The government, Schapiro, Curley, Lech, Tantillo, and Gaudelli were present at a full hearing held on July 28.[2] At the beginning of the hearing, Schapiro advised the Court that he did not believe Lech wanted to substitute counsel at this late date. Schapiro also represented to the Court that he did not learn of the connection between his office and Tantillo until the government's production of 3500 material the day before, and that he had not been a member of the Federal Defender Division at any time during which Curley represented Tantillo. Schapiro and Curley declared that they had conversed generally about Tantillo just prior to the July 27 conference, merely to confirm the period of Curley's representation of Tantillo. No further conversations were held between Curley and Schapiro regarding either Tantillo or Lech. Both affirmed that no client confidences were ever revealed to Schapiro.

Schapiro and Curley represented that a strict "Chinese Wall" would be maintained between them for as long as necessary. To ensure that none of Tantillo's confidences are revealed, Schapiro and Curley agreed to separate their work areas and files. Schapiro and Curley further agreed to have another staff member remove any computer files regarding Tantillo from office hard drives, and to ensure that Tantillo's file is kept away from any person connected to the Lech case. Schapiro and Curley also agreed to take the necessary precautions to ensure that no secrets are revealed by any support personnel who worked on Tantillo's case.

After conferring with his attorney, Tantillo waived any potential conflict in having one of Curley's colleagues represent Lech. For the reasons to be discussed, I concluded that under the unique circumstances of this case, only a potential conflict of interest existed with Schapiro's continued representation of Lech. I then began the first phase of a *Curcio* hearing, during which I explained the possible dangers of a conflict to Lech. I appointed a Criminal Justice Act Panel

("CJA") attorney to advise Lech independently about his situation. Later that afternoon, Lech and his CJA attorney returned. Lech indicated a desire to waive Schapiro's potential conflict, but based upon his answers at the earlier *Curcio* hearing and his request to have the CJA attorney attend the trial as a monitor, I concluded that Lech did not fully understand the consequences of a waiver. I, therefore, postponed Lech's trial for a week, and set another *Curcio* hearing for Thursday August 3, 1995.

### *Discussion*

### I. *The Conflict of Interest*

■ The Sixth Amendment to the Constitution provides

[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury ... and to have the assistance of counsel for his [or her] defence.

U.S. Const.Amend. VI. While the Sixth Amendment does encompass the right to be represented by the attorney of one's choice, the essential aim of the right to counsel is to ensure an effective advocate for all criminal defendants. *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). Thus, the Sixth Amendment encompasses the right to representation free from conflicts of interest. *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981) (citing *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

■ Where a criminal defendant wishes to be represented by an attorney who has a conflict of interest, a court must first determine whether the conflict is actual or potential. An actual conflict is one that is so "severe" that "no rational defendant would knowingly and intelligently desire the conflicted lawyer's representation. . . ." *United States v. Levy,* 25 F.3d 146, 153 (2d Cir.1994) (citing *United States v. Fulton,* 5 F.3d 605,

---

**2.** Gaudelli, Tantillo's attorney, participated at the hearing via speaker phone because he was away on vacation. I explained the situation in open court, and had Curley and Schapiro describe their communications about the case on the rec-

ord. I then allowed Tantillo to speak with Gaudelli in the privacy of my Robing Room before Tantillo was asked whether he objected to Schapiro's continued representation of Lech.

612–614 (2d Cir.1993)). Where a conflict of interest is actual, a court is "obliged" to disqualify the attorney.[3] *Id.*

■ A potential conflict of interest, by contrast, is a "lesser" conflict. *Id.* That is, a potential conflict exists where a court finds that "a rational defendant could knowingly and intelligently desire the conflicted lawyer's representation...." *Id.* If such a finding is made, the district court should conduct a hearing, as set forth in *United States v. Curcio,* 680 F.2d 881, 888–90 (2d Cir.1982), to obtain a knowing and intelligent waiver of the conflict directly from the defendant.[4] Federal courts have an independent interest in ensuring that legal proceedings are fair and appear that way to all who observe them, and may, therefore, reject a proffered waiver. *Fulton,* 5 F.3d at 612 (citing *Wheat,* 486 U.S. at 159, 108 S.Ct. at 1697).

■ Although the line between actual and potential conflicts of interest is not always clear, generally actual conflicts exist where a court finds that the conflict is so serious that it impedes the attorney's ability to present a vigorous defense. Thus, the Second Circuit has described a conflict as actual when "during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993) (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 356 n. 3, 100 S.Ct. 1708, 1722 n. 3, 64 L.Ed.2d 333 (1980)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994). Actual conflicts of interest have been found where a particular attorney has represented a witness or co-defendant, and has gained personal knowledge that could impede his or her representation of the defendant. *See United States*

*ex rel. Stewart on behalf of Tineo v. Kelly,* 870 F.2d 854, 856 (2d Cir.1989) (trial court did not abuse discretion in dismissing attorney who represented defendant and prosecution witness); *see also United States v. Rahman,* 861 F.Supp. 266, 274 (S.D.N.Y.1994) (Mukasey, J.) (finding actual conflict in multiple representation when lawyer unable to protect interests of each client). In *Iorizzo,* defense counsel had previously represented a key prosecution witness before a state tax board. Although the witness's prior testimony was relevant to the defense case, defense co not use that testimony to attack the witness's credibility without placing their former relationship at issue. *Iorizzo,* 786 F.2d at 57. *See also Lopez v. Scully,* 58 F.3d 38, 41–42 (2d Cir.1995) (actual conflict of interest when a defendant alleged that his lawyer coerced him to plead guilty); *United States v. Locascio,* 6 F.3d 924, 931 (2d Cir.1993) (counsel implicated in a criminal scheme related to the trial), *cert. denied,* —— U.S. ——, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994).

■ I agree with the Federal Defender Division and the United States Attorney's Office, which both argue that no actual conflict of interest exists here. Lech's situation is different from that presented in *Stewart, Iorizzo,* and *Rahman,* because the individual who represented Tantillo, Curley, does not represent Lech. Lech's attorney, Schapiro, has no knowledge whatsoever of any confidences shared between Tantillo and Curley. Thus, Schapiro does not possess any information that could inhibit him from presenting a vigorous defense at trial. The instant conflict of interest arises solely from the fact that attorneys from the same office, the Federal Defender Division, represented Tantillo and Lech at different times.

---

3. In requiring that an attorney with an actual conflict of interest be disqualified, the *Levy* Court apparently adopted a more stringent standard than that required by the Supreme Court. *See Wheat,* 486 U.S. at 162, 108 S.Ct. at 1698 ("where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver....").

4. In conducting a *Curcio* hearing, a district court should:

(1) advise the defendant of the dangers arising from the particular conflict;
(2) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them, and;
(3) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel.

*See United States v. Iorizzo,* 786 F.2d 52, 59 (2d Cir.1986) (summarizing *Curcio* ).

The ABA Model Rules of Professional Conduct, the ABA Model Code of Professional Responsibility, and the New York Code of Professional Responsibility all prohibit members of the same firm from representing clients in matters which are materially adverse to the interests of a former client unless the appropriate waivers have been obtained.[5] *See* ABA Model Rules of Professional Conduct 1.9 and 1.10; ABA Model Rules of Professional Responsibility DR 5–105; New York Code of Professional Responsibility DR 5–105.

One of the main presumptions underlying this prohibition is that lawyers in the same firm either share or have access to the confidences of all of the firm's clients. Some courts and commentators believe, however, that this presumption must be viewed flexibly in cases involving government departments and legal aid societies, because frequent turnover and heavy caseloads considerably reduce access to client confidences. *See, e.g., United States v. Judge,* 625 F.Supp. 901, 902–03 (D.Hawaii 1986) (finding "Chinese Wall" sufficient to rebut presumption that client confidences shared where federal defenders represented prosecution witness on prior unrelated case) (citing ABA Comm. on Ethics & Professional Responsibility, Formal Op. 342 (1975), *reprinted in,* 62 A.B.A.J. 517 (1976)); ABA Model Rule 1.10, cmt. 3 (court considering whether to treat legal service attorneys as members of the same firm should consider particular rule involved as well as specific facts of situation).

While the importance of protecting client confidences and of not having one organization represent potentially adverse interests

cannot be diminished, in light of the facts revealed at the hearing and the unique circumstances of this case, automatically disqualifying the Federal Defender Division from representing Lech is fundamentally unfair. A rational defendant in this situation could knowingly and intelligently desire Schapiro's representation. Schapiro has a close relationship with Lech, developed over the past year. Schapiro is intimately familiar with all aspects of Lech's case, including the facts, the motion practice, and the numerous discovery disputes that have occurred. Schapiro also knows the substance of the government's case, and how a jury reacted to it, because he attended the critical portions of the Fulton trial. If Schapiro is relieved as counsel, Lech's trial date will have to postponed to allow his new attorney sufficient time to learn and prepare his case. Lech maintains that in addition to increasing his anxiety, a delay of his trial will worsen his already difficult financial situation because few people have been willing to hire him while the charges against him have been pending.

I have no reason to disbelieve Curley's and Schapiro's representations that none of Tantillo's confidences were revealed to Schapiro, and that an effective "Chinese Wall" can and will be maintained between them. I do not see anything in this particular situation which impedes Schapiro's ability to continue his vigorous defense of Lech, and neither do I see a digression of interests between Lech and Schapiro with respect to known issues in this case.[6] Finally, a reasonable observer knowing the unique facts of this case would perceive Schapiro's representation of Lech as

---

5. The Southern District of New York generally disciplines attorneys when their conduct violates either the ABA Model Code of Professional Responsibility or the New York Code of Professional Responsibility. *See* Rule 4(f) of the General Local Rules for the United States District Courts for the Southern and Eastern District of New York; *see also Polycast Technology Corp. v. Uniroyal, Inc.,* 87 Civ. 3297 (CSH), 1990 WL 180571 at *1 (S.D.N.Y. November 15, 1990) (Haight, J.) (where Model Code and Model Rules conflict, preference given to Model Code) (citing *United States v. Hammad,* 858 F.2d 834, 837 (2d Cir. 1988); *United States v. Peng,* 766 F.2d 82, 86 n. 1 (2d Cir.1985), *cert. denied,* 498 U.S. 871, 111 S.Ct. 192, 112 L.Ed.2d 154 (1990)).

6. As with all *Curcio* situations, it is possible that a conflict may arise at trial. For example, Tantillo might testify that Curley told him either to act or not to act in a certain way. Such a statement might then raise a conflict of interest for Schapiro. There is nothing known to the Court, either in the 3500 materials produced by the government or in Tantillo's testimony during the Fulton trial, that suggests that the possibility of such a statement or any other imaginable scenario is anything more than speculative. Hence, I am not aware of anything that raises an actual, as opposed to a potential, conflict of interest.

fair. Accordingly, Lech could rationally choose to continue with Schapiro's representation. If this is Lech's desire, however, he must make a knowing and intelligent waiver of the potential conflict of interest. The Court will explain this issue further at the August 3, 1995 hearing.

## II. *Lech's Motion for Sanctions*

■ Lech argues, with some force, that he should not have to waive either his right to conflict-free representation or his right to a speedy trial because of the government's careless failure to disclose information about the conflict of interest until the eve of trial. Instead, Lech argues that the better solution is to preclude the government from calling Tantillo as a witness, thereby eliminating the potential conflict of interest. Although I am sympathetic to Lech's current situation, precluding Tantillo from testifying is an extreme sanction and would only harm the interests of justice. Because Tantillo is a major witness in the government's case, there is a substantial risk that precluding Tantillo's testimony would confuse the jury, and impede the conduct of a fair trial based upon all competent evidence.

It is important to note that at no time has any party alleged that the government's failure to disclose the potential conflict was the product of intentional misconduct. The parties agree that the government's error was the result of an oversight, although they disagree as to whether the error should be described as the product of mere or gross negligence.

The failure of the United States Attorney's Office to disclose possible conflicts of interest to defense counsel has not been limited to the instant prosecution. Although, I cannot say that such failures are so frequent as to warrant the extraordinary sanction of preclusion here, I am placing the United States

Attorney's Office on notice that a recurrence of this sort of problem might well lead to a different result in another case.

In *United States v. Vegas,* 92 Cr. 92 (RPP), 1993 WL 30937 (S.D.N.Y. February 4, 1993) (Patterson, J.), a defendant was represented by the Federal Defender Division, as was a confidential informant whom the government intended to call at trial. Counsel for the defendant learned of the conflict only when the United States Attorney's Office disclosed the identity of the confidential informant. Just as in the instant case, the disclosure in *Vegas* occurred almost a year after counsel for the defendant had been assigned to the case. Two days after learning of the conflict, counsel for the defendant moved to dismiss the indictment, or in the alternative for an order precluding the government from calling the informant at trial, to withdraw as counsel, and for sanctions against the government. Judge Patterson observed that the United States Attorney's Office had failed to disclose conflicts of interest to the Federal Defender Division in other cases.[7] In denying the sanctions motion, Judge Patterson believed that the then past Chief of the Criminal Division had made sincere efforts to remind Assistants to check for conflicts in the wake of these incidents.

In describing the efforts of the United States Attorney's Office, Judge Patterson referred to a letter issued by the United States Attorney's Office in response to complaints filed by the Federal Defender Division. In that letter, the former Chief of the Criminal Division remarked:

[y]ou are certainly correct that it is beneficial to everyone if conflicts involving the Legal Aid Society can be detected early in the process. Unfortunately, the only procedure that will assure such detection is for Assistants to be conscious of the problem, and to make efforts to check the

---

7. According to Schapiro, these cases were *United States v. Nunez, et al.,* 90 Cr. 751 (CSH) (Haight, J.); *United States v. Abreu,* 90 Cr. 494 (LLS) (Stanton, J.); and *United States v. Flores,* 90 Cr. 166 (LLS), 1990 WL 116732 (Stanton, J.). *See* First July 28 Letter at 4. At the July 28 hearing, Schapiro alleged that a similar failure to disclose a conflict occurred a few months ago in *United States v. Roland Williams,* 94 Cr. 651 (KTD)

(Duffy, J.). On August 3, 1995, Schapiro reported that additional failures to discover conflicts arose in *United States v. Bruce,* 94 Cr. 750 (AGS) (Schwartz, J.) and *United States v. Pablo Polanco,* 94 Cr. 481 (PKL) (Leisure, J.) (both government and assigned federal defender failed to recognize that same federal defender had also represented informant).

representation of co-defendants and other relevant individuals prior to arrest. This principle is already in place; regrettably, slip-ups do occur on occasion.

I apologize for the inconvenience to your Office that occurred in this matter, and I will make a point of reminding Assistants at the next Criminal Division meeting of the need for care in this regard.

Letter of Gerard E. Lynch, attached to Second Letter to the Court of Andrew H. Schapiro, dated July 28, 1995.

While efforts to remind Assistant United States Attorneys to check for conflicts may have been earnest and well intentioned, they certainly were not successful. I realize that oversights do occur, but the failure of the United States Attorney's Office to have a procedure in place to check who has represented cooperating witnesses, confidential informants, and co-defendants in other proceedings costs a great deal to defendants, their counsel, and the Court. Given the high turnover rate in the United States Attorney's Office, I do not believe that reminders to check for conflicts of interest are sufficient to create a permanent solution to this conduct. Instead of assessing blame, it is my hope that the United States Attorney's Office will expend its energies developing a substantive procedure to check continuously for possible conflicts in order to ensure immediate identification. The need for a procedure that requires supervisors and Assistant United States Attorneys to monitor for conflicts is especially great in complex prosecutions, where changes in the prosecution team and superseding indictments can create previously non-existent conflicts. By following a well-established procedure, conflicts will be discovered well in advance of trial.

Schapiro has brought to the Court's attention a number of cases involving similar oversights by the United States Attorney's Office, *supra*, at note 8. In light of the large number of prosecutions conducted each year, I cannot say, on the record before me, that the conduct of the United States Attorney's Office in this case is so egregious that the drastic remedy of precluding a central witness's testimony is warranted. Although choosing a conflict-free attorney would delay the trial and thus cause some prejudice to Lech, the delay would not be substantial. Lech's trial will not be as long or as complex as Fulton's. The bulk of the government's evidence at the Fulton trial concerned the 402 Eastern parkway project, a scheme in which Lech is not charged. Balancing the equities of the situation, I determine that the sanction requested here is inappropriate. Nevertheless, I hope that my colleagues will consider following Judge Patterson's lead by writing about these occurrences so that their frequency can be measured more accurately and the possible need for extreme sanctions can be more fully assessed.

### Conclusion

Lech's motion to preclude the government from offering the testimony of the cooperating witness at his upcoming trial is denied. Either Lech will be permitted to waive Schapiro's potential conflict of interest, or a new attorney will be appointed and given every opportunity and resource to familiarize him or herself with this case.

**SO ORDERED.**