**UNITED STATES of America,**

v.

**Arthur M. BLAU, Defendant.**

**No. 95 Cr. 556(DAB).**

United States District Court,
S.D. New York.

April 21, 1997.

Mary Jo White, United States Attorney for the Southern District of New York, New York City (Michael A. Rogoff, Celeste L. Koeleveld, Hector Gonzalez, Assistant United States Attorneys, of counsel), for U.S.

Anderson Kill & Olick, P.C., New York City (John H. Doyle, III, of counsel), for Defendant.

## MEMORANDUM and ORDER

BATTS, District Judge.

On June 26, 1995, Arthur Blau, the Defendant, was charged in a three-count Indictment with violations of 18 U.S.C. § 1954.[1] On July 12, 1996, Defendant was convicted on Count Three, acquitted on Count Two and a mistrial was declared as to Count One. Defendant moves for a judgment of acquittal or, in the alternative, for a new trial.

## I. BACKGROUND

Beginning in or about February 1992, the United States Attorney's Office for the Southern District of New York, the Federal Bureau of Investigation ("FBI"), the Department of Labor ("DOL") and the Internal Revenue Service ("IRS") commenced an investigation into certain real estate transactions involving the Mason Tenders District Council of Greater New York's ("Mason") trust funds. (Snyder Aff. ¶ 1.) The investigation resulted in the issuance of numerous grand jury subpoenas, including a 34–count Indictment, issued on September 10, 1992, charging Ron Miceli, Frank Lupo and Charles Trentacosta with racketeering, conversion of pension fund assets, mail fraud and money laundering. (Snyder Aff. ¶ 3; Doyle Aff. ¶ 13; Blau Ex. A.) The charges centered on the use of Mason pension funds to purchase real estate in Manhattan and Brooklyn at grossly inflated prices from associates of the Genovese Crime Family. (Snyder Aff. ¶ 3.) The bloated prices paid by the pension fund for the real estate were supported by false appraisals prepared by individuals associated with one of the organized crime associates. (*Id.*) Assistant United States Attorney Orin Snyder was assigned to the case. (Snyder Aff.; Gov't Mem. Law at 9.)

Part of the investigation of Mason included an immunized interview of the Defendant. (Snyder Aff. ¶ 4.) Defendant was a partner in Blau, Soloway, Goldstein & Co., an accounting firm which provided services to Mason. (Doyle Aff. ¶ 7; Maffeo Aff. ¶ 2.) On March 16, 1992, Defendant was served with a grand jury subpoena. (Doyle Aff. ¶ 6; Maffeo Aff. ¶ 2 & Ex. A.) He hired the firm of Bernstein & Maffeo to represent him. (Doyle Aff. ¶ 8; Maffeo Aff. ¶ 2.) They contacted AUSA Snyder seeking information regarding the subpoena and, once learning of the subpoena's background, informed AUSA Snyder that the Defendant would invoke his Fifth Amendment privilege if called before the grand jury. (Doyle Aff. ¶ 8; Maffeo Aff. ¶ 3 & Ex. B.) The Defendant also declined a request that he be questioned about the investigation. (Doyle Aff. ¶ 8.)

On April 3, 1992, a subpoena duces tecum was served on the Defendant. (Doyle Aff. ¶ 9; Maffeo Aff. ¶ 4 & Ex. C.) Upon discussion with AUSA Snyder, it was agreed the subpoena would be addressed to Blau, Soloway, Goldstein & Co. (Maffeo Aff. ¶ 4 & Ex. D.) On June 4, 1992, AUSA Snyder once again expressed an interest in meeting with the Defendant, which request was once again denied. (Maffeo Aff. ¶ 5.) On August 28, 1992, a further subpoena was served on the Defendant requiring handwriting samples and fingerprints. (Doyle Aff. ¶ 11; Maffeo Aff. ¶ 6 & Ex. E.)

---

**1.** Count One of the Indictment reads in part that the Defendant "unlawfully, wilfully and knowingly did directly and indirectly give, offer, and promise to give and offer a fee, kickback, commission, gift, loan, money and thing of value, to wit, thousands of dollars in cash, to a trustee of an employee welfare benefit plan and an employee pension benefit plan, to wit, the benefit plans of the Mason Tenders District Council of Greater New York, because of and with intent to influence the actions, decisions and other duties of said trustee relating to matters concerning the benefit plans." Count Two is identical, except that it applies to a different time period. Count Three is also identical, except that it applies to a different plan, ("Carpenters").

On September 9, 1992, by letter from AUSA Snyder, Defendant was informed that he was now a target of the investigation. (Doyle Aff. ¶ 12; Maffeo Aff. ¶ 7 & Ex. F; Bernstein Aff. ¶ 3.) On September 25, 1992, an attorney proffer was made to AUSA Snyder, as to what the Defendant would testify to, if granted immunity. (Doyle Aff. ¶ 14; Maffeo Aff. ¶ 10; Bernstein Aff. ¶ 5.) On October 6, 1992, the Government sought a court order of immunity for the Defendant which was granted by Judge Kevin Thomas Duffy. (Doyle Aff. ¶ 15; Bernstein Aff. ¶ 7.) Pursuant to the Order, Defendant attended one debriefing session, conducted by AUSA Snyder, on October 28, 1992. (Doyle Aff. ¶ 16; Bernstein Aff. ¶ 8; Snyder Aff. ¶ 4; Gov't Mem. Law at 9.)

During the debriefing session, Defendant provided information regarding "his knowledge and recollections concerning the real estate transactions, as well as the role of Frank Lupo and Roger Levin in the perpetration of the fraud." (Doyle Aff. ¶¶ 16–17; Bernstein Aff. ¶¶ 9–10.) It appears the Defendant made no incriminating statements or admissions about his involvement in the real estate transactions, or any other criminal activity. (11/13/95 Affidavit of Robert S. Franklin ¶¶ 12–15; Bernstein Aff. ¶¶ 9–10; Snyder Aff. ¶ 4; Gov't Mem. Law at 10.)

Subsequent to the proffer, Defendant supplied, pursuant to subpoena, his personal diaries and telephone logs (collectively "diaries") under the assumption that they would be covered by the grant of immunity.[2] (Doyle Aff. ¶¶ 19–21; Maffeo Aff. ¶ 14 & Ex. G–H; Bernstein Aff. ¶ 13; Snyder Aff. ¶ 6; Gov't Mem. Law at 10.)

On January 7, 1993, Lupo pled guilty to participating in racketeering activities. (Doyle Aff. ¶ 23 & Ex. C; Snyder Aff. ¶ 6; Gov't Mem. Law at 11.) On January 13, 1996, the grand jury returned a superseding Indictment against Miceli and James Massera, who then pled guilty in April 1993. (Doyle Aff. ¶ 22 & Ex. C; Snyder Aff. ¶ 6; Gov't Mem. Law at 11.) The principal difference in the superseding Indictment was the

addition of Massera. (Doyle Aff. ¶ 22 & Ex. C; Snyder Aff. ¶ 6; Gov't Mem. Law at 11.)

The criminal investigation thereafter remained dormant until the fall of 1993. (Gov't Mem. Law at 11.) Lupo was sentenced in July 1993, to a 41 month term of incarceration. (Gov't Mem. Law at 11; Doyle Aff. ¶ 24 & Ex. C.) He then contacted an FBI agent two weeks later to explore cooperation. (Doyle Aff. ¶ 25; Gov't Mem. Law at 11–12.) Lupo entered a cooperation agreement on August 9, 1994. (Doyle Aff. ¶ 27 & Ex. D.) On September 2, 1994, Levin entered into a cooperation agreement. (Doyle Aff. ¶ 29 & Ex. E.) On June 26, 1995, a three-count Indictment against the Defendant was handed down. (Doyle Aff. Ex. A.)

At the time Lupo began providing information, AUSA Snyder was no longer involved in the Mason investigation. The Government represents that Snyder did not participate in the Lupo debriefings, nor did he communicate the information Blau had provided to anyone involved in the Lupo debriefings. The Government further represents that AUSAs Koeleveld and Gonzalez were not aware of the October 1992 proffer until the filing of this motion, nor did they use Defendant's diaries.

On July 11, 1995, Defendant retained Robert S. Franklin, pursuant to a written retainer agreement, to defend him at trial, which he did. (9/11/96 Franklin Aff. ¶¶ 2–3.)

Prior to representing the Defendant, Franklin had represented Thomas Nastasi, Jr., in connection with investigations involving the Carpenters. (9/11/96 Franklin Aff. ¶ 4.) Nastasi was terminally ill, and Franklin represented him until his death in October 1995. (*Id.*) Count Three of the Indictment alleged that Defendant made illegal payments to Nastasi through Levin.

In the retainer agreement Defendant was informed of this possible conflict. "A specific condition of this representation is that you will not become a cooperating witness for the government. If that condition is breached, you understand and agree that my representation of you will cease and you will be

---

2. The Government, for the purposes of this motion, has not challenged the Defendant's claim of immunity regarding the diaries. (Gov't Mem. Law at 10–11.)

required to retain other counsel." (9/11/96 Franklin Aff. Ex. A.) Franklin also spoke to the Defendant about a possible conflict. (9/11/96 Franklin Aff. ¶ 7.)

Prior to trial, Defendant filed a motion requesting dismissal of the Indictment, arguing that the diaries he provided on November 17, 1992, "undoubtedly allowed the investigators to focus their inquiry or characterize Mr. Blau in a particular way which has impacted on the government's decisions regarding the investigation and prosecution of Mr. Blau." (11/13/95 Franklin Aff. ¶ 18.) Furthermore, Defendant argued that the United States Attorney's Office, Civil Division, by obtaining an order unsealing the grand jury investigation and using it to institute a civil action shows that "there has been obvious concerted action between and among both divisions of the U.S. Attorney's office, the FBI, IRS as well as the Department of Labor." (11/13/95 Franklin Aff. ¶ 27.) From this the Court assumed Defendant was arguing that it was inevitable that the information provided in the diaries was used to bring the Indictment. On January 17, 1996, in a Memorandum and Order, the Court denied the motion at that time, finding that the Defendant had failed to show that the information he provided during the proffer session related in any way to the prosecution. The Court left open the opportunity for Defendant to move, again after trial. (1/17/96 Memorandum and Order at 10 & 11.)

For the reasons stated below, the Defendant's Motions are denied.

## II. DISCUSSION

A. Defendant's Motion for Judgment of Acquittal Based on Use of Immunized Testimony is Denied

■ It is well-established that the Government can compel a witness to give testimony or other self-incriminating information, by granting the witness immunity that is at least as broad as that provided by the Fifth Amendment privilege. *Kastigar v. United States*, 406 U.S. 441, 449, 92 S.Ct. 1653, 1658–

59, 32 L.Ed.2d 212 (1972); *United States v. Nanni*, 59 F.3d 1425, 1431 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 576, 133 L.Ed.2d 499 (1995). The grant of immunity pursuant to 18 U.S.C. § 6002, as was given in this case, meets this requirement, *Nanni*, 59 F.3d at 1431, and prohibits the government from using the information gathered from the witness, directly of indirectly, in a future prosecution. 18 U.S.C. § 6002; *Nanni*, 59 F.3d at 1431.

■ The first step in determining whether the immunized information has been used against the witness, in this case the Defendant, is to determine whether the information provided by the Defendant is related to the prosecution. *Kastigar*, 406 U.S. at 460, 92 S.Ct. at 1664–65 ( [o]nce a defendant demonstrates that he has testified, under ... immunity, to matters related to the federal prosecution); *Nanni*, 59 F.3d 1425 ("once the defendant shows that, under a grant of immunity, he has testified to matters related to the prosecution, the government has the burden ..."); *United States v. Tantalo*, 680 F.2d 903, 907 (2d Cir.1982) ("[t]he fact that the appellant testified to matters related to his federal prosecution cast upon the Government the burden of establishing that the evidence to be used to prove his guilt was derived from legitimate sources"); *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir. 1977) (before a *Kastigar* hearing is held the "district judge should first require [the Defendant] to demonstrate that she did in fact testify before the state grand jury under immunity on matters related to the federal prosecution").[3]

■ The Defendant has shown, and the Government does not deny, that the Defendant gave information pursuant to a grant of immunity at a proffer session on October 28, 1992, and in diaries turned over on November 17, 1992. However, Defendant does not allege that he made any statement regarding bribes or kickbacks in his diaries or at the proffer session. Instead, the Defendant states that his argument supporting judgment of acquittal is different from that made

---

**3.** The fact that some of these cases involved immunity provided by state courts does not change the inquiry, because whether the grant of immunity is from a state or federal court, the Government's burden is the same. *Nanni*, 59 F.3d at 1431.

at the pre-trial stage. Leaving it at that, the Defendant proceeds to argue the "chain of taint" theory without addressing the "relatedness." However, the Court has found nothing to suggest that there is a difference in the starting points of an inquiry, to determine whether the immunized testimony was allegedly used, depending on whether it was used directly or indirectly. Accordingly, having once again failed to show that the information given at the proffer session and his subsequent prosecution are related, the Defendant's motion is denied

■ Assuming arguendo, that the Defendant could prevail beyond this point,

> [o]nce a defendant demonstrates that he has testified, under … immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence. [Murphy v. Waterfront Comm'n], 378 U.S. [52], … 79 n. 18 [ (1964) ]. This burden of proof … is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Kastigar,* 406 U.S. at 460, 92 S.Ct. at 1665 (quoting where indicated, *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1610 n. 18, 12 L.Ed.2d 678 (1964)); *Nanni,* 59 F.3d at 1432.

The Defendant does not allege that the Government used any information he provided, directly. Rather, he argues that the information he provided was considered by Lupo in his decision to plead guilty. According to the Defendant, Lupo, having pled guilty because of Blau's proffer, then decided to cooperate and implicated both Levin and the Defendant. Thereafter Levin pled guilty and also implicated the Defendant. The Defendant argues that, without the information he provided to the Government, Lupo would not have pled guilty and therefore Levin's plea and the Indictment against the Defendant is tainted by his immunized testimony.[4]

The Defendant's argument first depends on the unsupported assumption that the information he provided led to Lupo's plea. The only suggestion of this must be gleaned from the Affidavit of John L. Pollok, Lupo's attorney, which states, "During September of 1992, Mr. Lupo was aware that Mr. Blau had been subpoenaed to testify before the federal grand jury investigating Mr. Lupo." (Pollok Aff. ¶ 4.) Furthermore, Pollok states that he told Lupo that Blau had been offered immunity and had made a proffer. (Pollok Aff. ¶¶ 6–7.) However, Mr. Pollok does not state that the reason Lupo decided to plea, when he did, was influenced or occasioned by the Defendant's proffer session. Nor does he state that he or Lupo knew what was said during the proffer session, nor that AUSA Snyder revealed any information from Blau to further any plea negotiations with Lupo. On these facts, the Court cannot find that the fact that a proffer session took place, influenced Lupo's decision to pled guilty.

However, even if the Court were to infer that the proffer session was a contributing factor to the plea, the proffer session cannot be said to be a contributing factor to the decision to cooperate, which is what led to the Defendant's Indictment. The Court, having heard Lupo's testimony and finding him credible on this subject, and able to separate out his motivations for cooperating, finds that the Government has proven, by a preponderance of the evidence, indeed, beyond a reasonable doubt, that Lupo's decision to cooperate was not influenced by the information given by the Defendant. Lupo testified that he only decided to cooperate once he began to serve out his sentence because he wanted to be released from prison. (Tr. at 160.) He contacted the FBI agent, the FBI agent did not contact him.

---

4. The Defendant requests a *Kastigar* hearing so the Court can determine these issues. However, the Court has carefully reviewed the submissions and heard the trial testimony of the witnesses, including Levin and Lupo, and finds that a *Kastigar* hearing is unnecessary. *United States v.*

*Helmsley,* 941 F.2d 71 (2d Cir.1991), *cert. denied,* 502 *U.S. 1091,* 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992); *United States v. Biaggi,* 909 F.2d 662, 689–90 (2d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102 113 L.Ed.2d 213 (1991).

(Tr. at 33, 160–62.) At first, Lupo shielded the Defendant by withholding information regarding the Defendant and lying about the Defendant's involvement in any criminal acts. (Tr. at 233–34, 249–50.) *See generally Biaggi,* 909 F.2d at 690–91. In order to find a chain of tainted evidence, the Court must find that the information in the proffer session led to Lupo's cooperation. *Helmsley,* 941 F.2d at 82. The Court fails to see any connection here.

Furthermore, there is no indication, as explained in *Helmsley,* that the information here was used by the Government to induce or anger Lupo into pleading guilty or into cooperating. In fact, the opposite is true here. 941 F.2d at 83; *see also Biaggi,* 909 F.2d at 689. From all the submissions, it appears that the fact that the Defendant attended a proffer session under the grant of immunity had little, if any, impact on Lupo's decision to plead. There is no indication that Lupo ever knew what was said at the proffer sessions or that what was said influenced Lupo. And when Lupo did decide to cooperate, he contacted the FBI agent. The Court also takes note that Lupo was already indicted on information not provided by the Defendant, at the time of the proffer session. Therefore the Defendant's information did not lead the Government to Lupo.[5] See *United States v. Kurzer,* 534 F.2d 511, 517 (2d Cir.1976).

**B. Defendant's Motion for Judgment of Acquittal or a New Trial Based on His Sixth Amendment Right to Counsel is Denied**

Defendant argues that Nastasi could have been deposed before his death, at which deposition he would have denied the receipt of any bribes and accordingly, provided exculpatory evidence for the Defendant. (11/25/96 Franklin Aff. ¶ 2.) Defendant argues that Franklin's representation of the Defendant and Nastasi created an actual conflict of interest, which prevented Franklin from pursuing a deposition.

■ The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to have the assistance of counsel for his defense." U.S. Const. amend VI. This right encompasses the right to conflict-free counsel. *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *United States v. Levy,* 25 F.3d 146, 152 (2d Cir.1994); *United States v. Curcio,* 680 F.2d 881, 885 (2d Cir.1982). A defendant has suffered ineffective assistance of counsel, in violation of his Sixth Amendment rights, if there existed a potential conflict which prejudiced the defendant or there existed an actual conflict. *Levy,* 25 F.3d at 152. The Defendant claims there was an actual conflict.

■ If an actual conflict is found, a court must disqualify the attorney, because this type of conflict cannot be waived. *Levy,* 25 F.3d at 153. "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Levy,* 25 F.3d at 155 (quoting *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993), *cert. denied,* 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994)) (internal quotation marks omitted). When alleging an actual conflict, the defendant must show that the conflict adversely affected the attorney's performance, in that there was another defense tactic that could have been pursued, but was not, because it conflicted with the attorney's other interests. The Court finds that there was no actual conflict here. The attorney's interest in representing Nastasi did not diverge from that of Blau's interest. In fact, taking for the moment Nastasi's proposed deposition testimony as true, their interests were aligned. There has been no indication that there was another defense Franklin should have pursued that was diametrically opposed to Nastasi's interests.

■ Potential conflicts are conflicts that may be waived in order that the defendant be permitted to retain counsel of choice. *Williams v. Meachum,* 948 F.2d 863, 866 (2d Cir.1991). A waiver is accepted if it is a knowing and intelligent choice. *Williams,*

---

**5.** Accordingly, any leads provided by Lupo to Levin have no connection to the Defendant.

948 F.2d at 866–67. In determining this, the court is to look to the "particular facts and circumstances surrounding [the] case, including background, experience, and conduct of the accused." *Williams*, 948 F.2d at 866. Usually, a court will be able to judge these factors before a trial takes place, because the attorneys or the defendant will inform the court of a potential conflict. Here, the Court was neither informed nor could it have surmised that there was a conflict.[6] *Bridges v. United States*, 794 F.2d 1189, 1193 (7th Cir. 1986); 9/11/96 Franklin Aff. ¶ 8. This does not mean, however, that a waiver cannot be determined without the usual inquiry made by the Court at a *Curcio* or other similar hearing. *See, e.g., Bridges*, 794 F.2d at 1193.

■ The Court is troubled by what it views as possible gamesmanship. This is the first time the Defendant has raised this issue. The Defendant and his attorney, realizing there was a potential conflict, possibly withheld that information so it could be included in the arsenal of appellate issues. A Defendant cannot withhold a possible conflict from the Court's attention and then, only after trial, bring it to the Court's attention, requesting a new trial.[7] The Defendant has not given any reason why this conflict was not brought to the Court's attention prior to this time.

The Court finds that a potential, and therefore waivable, conflict, at best, was created by defense counsel and Defendant's studied silence on this issue until post-conviction motions, and not an actual conflict. Defendant waived this conflict when he signed the retainer agreement. Although he knew there were potential conflicts, he still retained Franklin. The Defendant is an educated man, having graduated from law school. He is an experienced professional. The Court was able to assess him during his testimony and he appears to be an intelligent and thoughtful man. Furthermore, the Defendant made the informed, conscious choice to fire his first experienced defense attorney, Gary Naftalis, Esq., and replace him with Mr. Franklin.[8] The Court finds that the Defendant made the informed choice to hire Mr. Franklin, warts and all. To permit him to raise this issue now, after failing to inform the Court, prior to trial, would be inappropriate. The Court finds his waiver was knowingly, intelligently and voluntarily made. *United States v. Bonilla–Marquez*, 924 F.2d 770 (8th Cir.1991); *Bridges*, 794 F.2d 1189.

### III. CONCLUSION

Accordingly, the Defendant's motion for a judgment of acquittal and, in the alternative, for a new trial is DENIED.

SO ORDERED.

---

**6.** Only once a court is advised of a potential conflict it has an "inquiry" obligation and a "disqualification/waiver" obligation. *Levy*, 25 F.3d at 153.

**7.** This is also known as "chutzpah," which has been explained in legal circles as the anomalous circumstance where a defendant shoots his parents, then throws himself on the mercy of the court because he is an orphan.

**8.** The Defendant also had other counsel prior to trial, Mr. Maffeo and Mr. Bernstein.