**UNITED STATES of America, Appellee,**

v.

**Arthur M. BLAU, Defendant–Appellant.**

**Docket 97–1431.**

United States Court of Appeals,
Second Circuit.

Argued April 24, 1998.

Decided Oct. 16, 1998.

See also: 913 F.Supp. 218.

J. Bruce Maffeo, Seiff & Kretz, New York, NY, for Defendant–Appellant.

Celeste L. Koeleveld, Assistant United States Attorney, New York, NY (Mary Jo White, United States Attorney for the Southern District of New York, Hector Gonzalez, Craig A. Stewart, Assistant United States Attorneys, New York, NY on brief), for Appellee.

Before: WALKER and CALABRESI, Circuit Judges, and RESTANI, Judge*.

WALKER, Circuit Judge:

Defendant-appellant Arthur M. Blau appeals from the judgment of the United States District Court for the Southern District of New York (Deborah A. Batts, District Judge), convicting him, after a jury trial, of offering kickbacks to influence the operations of an employee benefit plan, in violation of 18 U.S.C. § 1954. Blau was sentenced, in principal part, to thirty-six months' imprisonment, to be followed by one year of supervised release. On appeal, Blau contends that (1) the district court erred in denying his post-trial motion for a *Kastigar* hearing into whether the government improperly employed a proffer, given by Blau under a grant of immunity pursuant to 18 U.S.C. § 6002, to indict Blau and obtain his conviction, and (2) his trial attorney, Robert S. Franklin, rendered ineffective assistance due to a conflict of interest arising out of Franklin's representation of the recipient of Blau's bribes. We affirm.

## BACKGROUND

On June 26, 1995, a federal grand jury returned a three-count indictment charging Blau, a certified public accountant, in each count with violating 18 U.S.C. § 1954, which makes it a crime to bribe one who has authority over an employee benefit plan and who receives money with intent to be influenced in connection with the plan. Count One related to bribing Frank Lupo, a trustee of the Mason Tenders District Council of Greater New York ("Mason Tenders") from 1989 to 1991. Count Two related to bribing Frank Lupo's brother, James Lupo, who succeeded Frank from 1992 to 1993 as a trustee of the Mason Tenders Funds. Count Three

---

* The Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

related to bribing Thomas J. Nastasi, a trustee of the New York District Council of the United Brotherhood of Carpenters and Joiners of America ("Carpenters") from 1992 through 1993. Blau made the bribes to secure contracts for Blau's accounting services with the plans run by the Mason Tenders and the Carpenters.

The jury found Blau guilty on Count Three, not guilty on Count Two, and was unable to reach a verdict on Count One, as to which the district court declared a mistrial. The district court denied Blau's post-trial motions for a judgment of acquittal and, in the alternative, for a new trial, see *United States v. Blau*, 961 F.Supp. 626, 633 (S.D.N.Y.1997) (*"Blau II"*), and sentenced Blau on Count Three, in principal part, to thirty-six months' imprisonment, to be followed by one year of supervised release.

The proof at trial as to Count Three established that Blau paid kickbacks to Nastasi from March 1992 until April 1993 to obtain accounting work at the Carpenters Funds. Blau obtained the cash for the kickbacks from his former accounting firm partners— Herman Soloway, Edward Goldstein and Ray Froimowitz—and made the payments to an attorney for the Carpenters Funds, Roger Levin, who then delivered the cash to Nastasi. The government relied at trial upon the testimony of Levin, Soloway, Goldstein and Froimowitz.

The jury also heard testimony relating to Counts One and Two from Frank Lupo and Roger Levin. As to Count One, Lupo testified that he received kickbacks from Blau starting in 1989, when Lupo became President of the Mason Tenders, and Levin, who also represented the Mason Tenders, testified that in 1993 Blau admitted paying kickbacks to Frank Lupo and had shown Levin a ledger reflecting the payments. As to Count Two, the only proof was Levin's testimony that, on several occasions in 1993, he had been instructed by a Mason Tenders Funds supervisor to pick up envelopes from Blau.

In his defense, Blau denied making payments to Nastasi, whom Blau knew to be an influential trustee of the Carpenters Funds. Blau similarly denied making payments to either Frank or James Lupo, or to anyone affiliated with the Mason Tenders Funds.

After the jury's verdict, appellant unsuccessfully moved for a judgment of acquittal, see Fed.R.Crim.P. 29, and, in the alternative, for a new trial, see Fed.R.Crim.P. 33, on the grounds that (1) his indictment and conviction resulted from information derived by the government from a proffer given by Blau in October 1992 under a grant of immunity pursuant to 18 U.S.C. § 6002 and from his immunized production of documents in November 1992, and (2) Blau's right to counsel was violated by an alleged conflict arising from his trial attorney's simultaneous representation of both Blau and Nastasi.

## DISCUSSION

### I. Kastigar Claim

Blau contends that the district court erred in denying his post-trial motion for a hearing, pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), into whether the government, in obtaining the indictment and conviction in this case, improperly used or relied on a proffer that Blau gave under a grant of immunity several years earlier. Specifically, Blau claims that a *Kastigar* hearing was warranted since his immunized proffer "apparently" caused Frank Lupo to plead guilty and cooperate against Blau, which in turn led Roger Levin to plead guilty and cooperate against Blau as well. Blau's *Kastigar* claim requires further explication of the relevant facts.

In February 1992, the United States Attorney's Office for the Southern District of New York, the Federal Bureau of Investigation ("FBI"), the United States Department of Labor, and the Internal Revenue Service began an investigation into various real estate transactions involving the Mason Tenders Funds. The grand jury issued subpoenas and witnesses were interviewed by the prosecutors. In March 1992, Blau, as the outside accountant for the Mason Tenders pension funds, was subpoenaed to appear before a grand jury. Blau informed the government that, if called to testify, he would invoke his privilege against self-incrimina-

tion. Blau subsequently received and complied with a subpoena duces tecum directing that he produce numerous business records from the files of his accounting firm.

On September 10, 1992, the grand jury indicted Ron Miceli, Frank Lupo and Charles Trentacosta and charged them with racketeering, conversion of pension fund assets, mail fraud and money laundering. The charges arose from the use of the Mason Tenders pension funds to buy real estate in Manhattan and Brooklyn at inflated prices from associates of the Genovese Organized Crime Family. The inflated prices were supported by phony appraisals prepared by individuals with ties to organized crime.

In late October 1992, Blau, accompanied by counsel, attended a proffer session pertaining to the Mason Tenders real estate transactions, under a grant of immunity pursuant to 18 U.S.C. § 6002. At that session, Blau provided his recollections of the real estate transactions at issue, focusing on the roles of Frank Lupo and Roger Levin in the perpetration of the fraud. Prior to his indictment, Frank Lupo was the President of the Mason Tenders and a trustee of the Mason Tenders Funds. Blau made no incriminating statements or admissions during the proffer about his involvement in the real estate transactions or in any other criminal activity. Blau was never asked about, nor did he provide, any information concerning any alleged kickbacks he may have made to representatives of the Mason Tenders Funds, or to any other entity.

On November 17, 1992, Blau produced certain personal and telephone diaries that were requested by a grand jury subpoena duces tecum. An accompanying letter from counsel stated that the documents were being produced under compulsion of the prior immunity order.

Frank Lupo's attorney, John L. Pollok, submitted an affidavit in the district court to the effect that Pollok was aware of Blau's immunized proffer and his production of documents in connection with the proffer, and that Pollok told Lupo about the proffer and document production.

On January 7, 1993 Frank Lupo pled guilty to one count of racketeering arising out of the Mason Tenders real estate transactions. Lupo was sentenced on July 16, 1993 to imprisonment for forty-one months, three years' supervised release and a fine of $15,000.

About two weeks after he began his sentence on September 14, 1993, Lupo contacted FBI Special Agent Paul Meyer to explore the possibility of cooperating with the government. At appellant's trial, Lupo testified that when Meyer arrested him, Meyer told Lupo that he could help him if Lupo ever decided to cooperate. On cross-examination, Lupo acknowledged that his "absolute[ ]" purpose in seeking out Special Agent Meyer was "to try to get out of prison." Between October 1993 and May 1994, Lupo met frequently with Special Agent Meyer and other government representatives which resulted in a cooperation agreement in August 1994.

Lupo testified that he was a "very close" friend of Blau, that their families had a social relationship, and that these circumstances led Lupo to hold back incriminating information as to Blau for months after he began cooperating. Lupo testified: "I was trying to protect [Blau] and cover up anything with him. I didn't want anything to come out to get him involved in any way." Lupo also admitted to lying initially to federal officials to avoid incriminating Blau.

Levin testified at trial that, after learning in May 1994 that he might be the target of a civil RICO case, he contacted the government in July with an eye toward cooperation. He entered into a formal cooperation agreement in September. There is no evidence in the record that, in deciding to cooperate, Levin was aware of Blau's immunized proffer and production of documents or Lupo's cooperation.

Before trial, Blau moved to dismiss the indictment on the basis that the involvement of multiple federal law enforcement agencies, as well as the Civil and Criminal Divisions of the United States Attorney's Office for the Southern District of New York, in the investigations of the Mason Tenders and Carpenters funds meant that immunized information provided by Blau in the 1992 proffer and

subsequent production of documents was used impermissibly to indict Blau in 1995.

The district court denied Blau's motion to dismiss the indictment, see *United States v. Blau*, 913 F.Supp. 218, 222 (S.D.N.Y.1996) ("*Blau I*"), on the ground that Blau had failed to meet his initial burden, under *Kastigar*, of demonstrating that his immunized testimony pertained " 'to matters related to the federal prosecution.' " *Kastigar*, 406 U.S. at 460, 92 S.Ct. 1653 (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678).

After trial, Blau moved for a judgment of acquittal or, in the alternative, for a new trial, on the ground that his indictment and conviction were derived from information Blau provided under a grant of immunity. The district court again denied Blau's *Kastigar* claim, and again found that Blau had failed to make a threshold showing that his proffer was related to the charges later filed against him. See *Blau II*, 961 F.Supp. at 630–31.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." In *Kastigar*, the Supreme Court upheld the constitutionality of the federal use immunity statute, 18 U.S.C. §§ 6002–03, see *Kastigar*, 406 U.S. at 462, 92 S.Ct. 1653, which provides that "no testimony or other information compelled under the [compulsion] order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case," 18 U.S.C. § 6002. The *Kastigar* Court stated that "[t]his total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead,' and also barring the use of any evidence obtained by focusing investigation on a witness as a result of his compelled disclosures." 406 U.S. at 460, 92 S.Ct. 1653 (footnote omitted).

To ensure that a witness's prior immunized testimony is not used, directly or indirectly, against him in a subsequent criminal case, *Kastigar*, set forth the following allocation of burdens:

"Once a defendant demonstrates that he has testified, under a state grant of immu-

nity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence."

*Id.* (emphasis added) (quoting *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964)).

In this case, Blau has failed to demonstrate that his proffer—in which he provided information about fraudulent real estate transactions involving the Mason Tenders Funds—and the charges in the indictment— which relate to Blau's alleged payments of kickbacks to officials of the Mason Tenders and Carpenters funds in exchange for accounting work—are factually related. In fact, on appeal Blau does not press the argument that in his immunized proffer he testified to "matters related to the federal prosecution." In the typical case, Blau's failure to show the requisite factual relationship would be sufficient to end the inquiry and avoid the necessity of a *Kastigar* hearing. See *United States v. Mariani*, 851 F.2d 595, 599–600 (2d Cir.1988) (describing the government's burden to show an independent source as arising "[w]here a witness is later prosecuted for an offense which was the subject of his testimony given under immunity"); *United States v. Nemes*, 555 F.2d 51, 55 (2d Cir.1977) (noting that, before holding a *Kastigar* hearing, the district court "should first require [the defendant] to demonstrate that she did in fact testify before the state grand jury under immunity on matters related to the federal prosecution").

■ Blau contends that, irrespective of whether a factual relationship existed between his immunized proffer and the later prosecution, a *Kastigar* hearing was warranted because there was a "chain of taint" leading from his immunized proffer and production of documents to the evidence that was ultimately employed against him. In making this argument, Blau places heavy reliance on *United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976). In *Kurzer*, Harry Kurzer, an accountant for several meat companies controlled by Moe Steinman, the original target

of the investigation, testified against Steinman before a federal grand jury under a grant of immunity. See *id.* at 513. After Steinman pleaded guilty to various charges and entered into a cooperation agreement, Steinman informed investigators of Kurzer's involvement in a meat-packing industry scheme to generate income using false invoices. See *id.* at 514. This information led to Kurzer's indictment for tax fraud. The district court granted Kurzer's motion to dismiss, finding that Kurzer's immunized testimony led the government to Steinman, who in turn led the government to Kurzer. See *id.* at 513–14.

We rejected the district court's conclusion that Kurzer's right against self-incrimination was violated solely because his "testimony set in motion the train of events which ultimately resulted in his own indictment." *Id.* at 515. But we held that the Fifth Amendment could be violated if Kurzer's testimony motivated Steinman's decision to come forward with evidence against Kurzer. See *id.* at 517; see also *United States v. Helmsley*, 941 F.2d 71, 82 (2d Cir.1991); *United States v. Biaggi*, 909 F.2d 662, 689–90 (2d Cir.1990). As we later recognized in *Helmsley*:

> In Kurzer, there existed a danger of manipulation by government investigators who might immunize a witness and then use the fact of the immunized testimony to anger a subject of the investigation and cause that subject in turn to incriminate the witness. Such a danger directly implicated Fifth Amendment policies, and thus testimony that might have resulted from such manipulation could not be used against the immunized witness.

*Helmsley*, 941 F.2d at 83.

Blau's "chain of taint" argument rests on the following logic: Blau's immunized testimony, by buttressing the case against Lupo, led to Lupo's decision to plead guilty. Lupo's guilty plea led to his decision to cooperate and to implicate Blau and Levin. This in turn led to the cooperation and testimony of Roger Levin against Blau.

■ Blau's series of "but for" causation connections between his immunized proffer and his ultimate conviction is insufficient to make out a viable *Kastigar* claim. See *id.*,

941 F.2d at 82. To make out a Fifth Amendment violation, Blau would have to demonstrate that Blau's proffer motivated Lupo and Levin to testify against him. *Id.* at 83. We see no basis for disturbing the district court's finding that no such showing was made. The district court, relying on the record developed at trial and in Blau's posttrial motion, found that Lupo chose to plead guilty and then to cooperate and provide evidence against Blau for reasons unrelated to Blau's immunized proffer. The district court credited Lupo's explanation at trial that it was solely Lupo's desire to be released from prison that led him to seek out FBI Agent Meyer, to cooperate with the government and, ultimately, to implicate Blau. *Blau II*, 961 F.Supp. at 631. In essence, the district court held that a critical link was missing in the "chain of taint," and, accordingly, declined to find a *Kastigar* violation. The district court's factual finding in this regard was not clearly erroneous, see *United States v. Rivieccio*, 919 F.2d 812, 814 (2d Cir.1990) (applying clear error standard to district court's *Kastigar* findings), nor did the district court err by making factual findings based on the trial record, rather than by holding a *Kastigar* hearing, see *Biaggi*, 909 F.2d at 690. Accordingly, we affirm the district court's denial of Blau's *Kastigar* claim.

## II. Sixth Amendment Claim

Blau's second claim on appeal is that his trial attorney, Robert Franklin, provided ineffective assistance of counsel because Franklin was in a conflict of interest due to his representation of Thomas Nastasi, the ultimate recipient of the kickbacks Blau paid to obtain Carpenters accounting work. More precisely, Blau claims that Franklin labored under a conflict of interest from July 11, 1995, when Blau retained him, until Nastasi's death in October 1995, prior to Blau's trial. Franklin had represented Nastasi in connection with a federal criminal investigation of the Carpenters Union.

Before entering into a retainer agreement, Franklin and Blau discussed the possibility of Franklin having a conflict. Franklin ex-

plained to Blau that a conflict of interest would arise if Blau or Nastasi were called as a witness against the other or if both were indicted. In an effort to alleviate the conflict that Franklin believed would exist if Blau decided to cooperate with the government, Franklin included the following language in his retainer agreement:

A specific condition of this representation is that you will not become a cooperating witness for the Government. If that condition is breached, you understand and agree that my representation of you will cease and you will be required to retain other counsel.

Nastasi was never indicted, and neither Franklin nor Blau ever divulged Franklin's dual representation of Blau and Nastasi to the government or the district court.

In his post-trial motion, Blau asserted for the first time that Franklin's representation of Nastasi violated Blau's right to conflict-free counsel. Blau contended that if Franklin had deposed Nastasi, Nastasi might have provided exculpatory testimony. Blau included Franklin's affidavit to the effect that when he was retained by Blau, Nastasi was terminally ill with cancer and thus was unlikely to be living at the time of Blau's trial. Franklin states that while "Nastasi could have been deposed on Mr. Blau's behalf, and at such deposition denied the receipt of any bribe payments directly or indirectly from Blau, [he] did not pursue, nor even consider the possibility of pursuing, a deposition from Mr. Nastasi to preserve it for Mr. Blau's trial."

The district court found that Blau had failed to demonstrate an actual conflict of interest and that any potential conflict of interest had been waived. See *United States v. Blau*, 961 F.Supp. 626, 632–33 (S.D.N.Y. 1997). In support of its finding of waiver, the district court expressed its concern at the "possible gamesmanship" involved in Blau's decision to withhold the conflict issue from the court's attention until after trial. See *id.* at 633.

■ The question of whether a defendant's lawyer's representation violates the Sixth Amendment right to effective assistance of counsel is a mixed question of law and fact that is reviewed de novo. See *United States v. Kliti*, 156 F.3d 150, 153–54 (2d Cir.1998) (citing *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996).)

■ A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel. See *Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Kliti*, 156 F.3d at 153; *United States v. Jiang*, 140 F.3d 124, 127 (2d Cir.1998); *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994). "[A] defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *Levy*, 25 F.3d at 152.

A. Waiver

■ For reasons set forth in Part II.B., we conclude that Blau's attorney faced only a potential conflict of interest in this case and not an actual one. A defendant who is faced with the possibility that his attorney might become conflicted may waive the potential conflict of interest "in order to retain the attorney of his choice." *Williams v. Meachum*, 948 F.2d 863, 866 (2d Cir.1991) (quoting *United States v. Curcio*, 680 F.2d 881, 885 (2d Cir.1982)). A defendant's waiver of conflict-free counsel will be honored if it is knowing and intelligent. See *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Whether a waiver is knowing and intelligent depends on the circumstances of each individual case as well as the background and experience of the accused.

■ It is plain to us that in this case Blau waived any potential conflict of interest. Franklin specifically told Blau about his representation of Nastasi and the conflicts that could result if either client were called as a witness against the other or if both were

indicted. Blau's awareness of the potential conflict is confirmed by the retainer agreement which specifically refers to it and in which Blau expresses his willingness to proceed with Franklin's representation even though Franklin would terminate his representation if Blau decided to cooperate. Blau's business and professional background, his experience as a practicing accountant, and his law school degree leave us confident in our conclusion that Blau's decision to hire Franklin after being informed of potential conflicts was both knowing and intelligent.

### B. No Actual Conflict of Interest

There is an actual conflict of interest when, during the course of the representation, the attorney's and the defendant's interest " 'diverge with respect to a material factual or legal issue,' " see *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 356 n. 3, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (Marshall, J., concurring in part, dissenting in part)), or when the attorney's representation to the defendant is impaired by loyalty owed a former client, see *United States v. Malpiedi*, 62 F.3d 465, 469 (2d Cir.1995). To show an actual conflict of interest, the defendant must demonstrate how his interests and those of his attorney diverged. See *United States v. O'Neil*, 118 F.3d 65, 71 (2d Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 728, 139 L.Ed.2d 666 (1998). Moreover, dual representation, standing alone, does not suffice to demonstrate actual conflict. See *Cuyler*, 446 U.S. at 346–48, 100 S.Ct. 1708.

Blau has failed to demonstrate that Franklin's representation of Nastasi created an actual conflict of interest. Blau contends variously that Franklin's dual representation precluded Franklin from deposing Nastasi before his death, from gathering impeachment materials on Nastasi, and from advising Blau to cooperate against Nastasi. We disagree.

No evidence in the record supports Blau's suggestion that Franklin's failure to depose Nastasi or to even consider the possibility stemmed from a conflict of interest. Nothing supports Blau's bald assertion that Nastasi, at a deposition, "would have" provided

testimony tending to exonerate Blau. In his affidavit, Franklin simply offers that Nastasi "could have been deposed … and at such deposition denied" receiving bribe payments from Blau. Moreover, even if we were to assume that Nastasi would have provided exculpatory information, an actual conflict does not appear. If Nastasi would have confirmed Blau's denial of making bribe payments, their interests would have been aligned, not in conflict.

We have considered Blau's other contentions regarding his attorney's alleged conflict of interest and find them to be without merit. Accordingly, Blau's claim that Franklin operated under an actual conflict of interest must fail.

### C. Failure to Inform the Trial Court of Potential Conflicts

We have repeatedly emphasized the trial court's role in advising the defendant of potential conflicts, see *Kliti*, 156 F.3d at 153; *Stantini*, 85 F.3d at 13; *Levy*, 25 F.3d at 152–53, and, if necessary, in conducting a *Curcio* hearing to determine whether the defendant knowingly and intelligently waived his right to conflict-free representation, see *Curcio*, 680 F.2d at 888–90. But in circumstances where a defendant is aware of a potential conflict, but fails to inform either the government or the court of them, we cannot fault the district court, much less entertain the possibility of reversing the defendant's conviction. Cf. *Kliti*, 156 F.3d at 153 ("When the trial court knows or reasonably should know of the possibility of a conflict of interest … and does not conduct this initial inquiry, reversal of a defendant's conviction is automatic.") (emphasis added) (internal citations omitted); *Mannhalt v. Reed*, 847 F.2d 576, 580–81 (9th Cir.1988) (finding no waiver where attorney failed to advise defendant of potential conflict and dangers of representation).

In this case, we easily conclude that the defendant's waiver was "voluntarily, knowingly, and intelligently made with sufficient awareness of the relevant circumstances and likely consequences." *Bridges v. United States*, 794 F.2d 1189, 1193 (7th Cir.1986)

(citing *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)); see also *United States v. Bonilla–Marquez*, 924 F.2d 770, 771 (8th Cir.1991). We are supported in this conclusion by our belief that Blau's attorney-conflict claim was obviously an afterthought. Despite Blau's prior knowledge, no suggestion of an attorney conflict of interest emerged until after Blau's conviction. We therefore reject Blau's Sixth Amendment claim.

## CONCLUSION

The judgment of the district court is affirmed.