SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

CREDIT BANCORP, LTD., et al., Defendants.

No. 99 CIV. 11395(RWS).

United States District Court, S.D. New York.

May 18, 2000.

Robert B. Blackburn, S.E.C., New York City, Thomas M. Melton, Salt lake City, UT, for S.E.C.

James B. Swire, Dorsey & Whitney, L.L.P., New York City, Lyndon Mitchell Tretter, Hogan & Hartson L.L.P., New York City, for Dr. Gene W. Ray.

William .A. Maher, Wollmuth, Maher & Deutsch, L.L.P., New York City, for Stephenson Equity Co.

Richard Marmaro, McCambridge, Deixler & Marmaro, Los Angeles, CA, for Richard Jonathan Blech.

Andrew Tomback, Milbank, Tweed, Hadley & McCloy L.L.P., New York City, for Thomas Michael Rittsweger.

Richard A. Getty, Getty, Keyser & Mayo, LLP, Lexington, KY, for Douglas C. Brandon.

Thomas R. Pattison, Pattison & Flannery, New York City, William R. Mait, Mait, Wang & Simmons, New York City, for Certain Underwriters at Lloyds at London, London Market Companies, Gulf Ins. Co., Federal Ins. Co.

Timothy J. Coleman, Assist. U.S. Atty., Mary Jo White, U.S. Atty., New York City, for U.S.

Michael J. Levin, Barger & Wolen, L.L.P., New York City, for Centigram Communications Corp.

## MEMORANDUM OPINION

SWEET, District Judge.

At the hearing held on May 16, 2000, pursuant to the Orders of April 5, April 18, April 24, and May 8, the Court heard testimony from Kenneth Lynch, Esq. ("Lynch") and Ira Sorkin, Esq. ("Sorkin") concerning (1) whether Lynch represented defendant Richard Blech ("Blech") in Blech's personal capacity, and (2) whether Blech authorized Sorkin to make certain statements on behalf of Blech to staff counsel of the Securities and Exchange Commission ("SEC") on December 2, 1999, and to this Court on December 3, 1999.[1] Upon conclusion of the hearing on May 16, this Court rendered tentative findings of fact, subject to consideration of further submissions on or before May 17. Submissions were received from Blech and from Carl H. Loewenson, Jr., Esq. ("the Receiver") on May 17, 2000, at which time the matter was deemed fully submitted.

### Lynch's Representation

It is undisputed that Lynch served as general counsel for Credit Bancorp, Ltd. ("Credit Bancorp") predating this litigation. The issue in dispute is whether or not Lynch also served as counsel to Blech, who was the sole shareholder, president, and chief executive officer of Credit Bancorp, in his personal capacity.

In his Declaration of March 11, 2000, Blech states that beginning in or about August 1999 he engaged Lynch to provide him with legal advice and representation on a number of personal issues. Blech further stated that, pursuant to that engagement, Blech and Lynch engaged in privileged communications concerning the nature, location, and other details of Blech's personal assets, including those listed in the Receiver's March 3, 2000 letter to the Court seeking a contempt order against Blech.[2]

1. In its letter submission of May 17, 2000, the Receiver also sought a ruling that Blech's authorization extended to statements made on Blech's behalf in a meeting with the office of the United States Attorney for the Eastern District of New York on December 15, 1999. Although this issue came up directly or indirectly in the testimony on May 16 and in the submissions received on May 17, this ruling would not be appropriate at this time because this was not a designated subject of the May 16 hearing. Thus, Blech should be given a further opportunity to submit evidence or argument. The Court invites Blech to do so on or before May 26, 2000. The Receiver shall submit any response to such submission on or before May 31, 2000.

2. Blech's counsel avers that Blech was at a disadvantage in these proceedings because he was unable to present his own live testimony. The Court notes, however, that it made every effort to accommodate Blech—even agreeing to testimony by video transmission from

The attorney-client privilege vis-a-vis counsel for a corporation generally belongs to the corporation. *See United States v. Internat'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO,* 119 F.3d 210, 214–15 (2d Cir.1997); *United States v. Piccini,* 412 F.2d 591, 593 (2d Cir.1969). Corporate employees who assert a personal privilege with respect to communications with corporate counsel have the burden of meeting the following test:

> First, [corporate employees] must show that they approached [counsel] for the purpose of seeking legal advice. Second, they must show that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must show that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And, fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.

*Teamsters,* 119 F.3d at 215 (citing *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 805 F.2d 120, 123 (3d Cir. 1986)).

Lynch denied unequivocally that he had a personal attorney-client relationship with Blech predating this litigation. Transcript of May 16 Hearing ("Tr.") at 51, 56, 67–68, 73–74. Lynch testified that Blech did not tell Lynch he was approaching him for individual legal advice on any issue, Tr. at 51, that Lynch did not provide such advice to Blech, Tr. at 73–74, that Lynch and Blech did not discuss Blech's personal assets, Tr. at 68, and that Lynch did not perceive a conflict of interest between representation of Credit Bancorp and of Blech because in fact Lynch represented only Credit Bancorp, Tr. at 74. This testimony,

which the Court finds credible, demonstrates that there was no personal attorney-client relationship between Blech and Lynch. *Cf. In re Grand Jury Subpoenas,* 144 F.3d 653, 659 (10th Cir.1998) (finding attorney-client privilege between corporate officer and corporate counsel where officer and counsel testified that officer sought advice in his individual capacity and counsel further testified that they recognized a potential conflict of interest).

Blech contends that, even if this Court finds Lynch's testimony to be credible, Lynch's testimony regarding Blech's meetings with counsel in November and December 1999 demonstrates a personal relationship with Lynch at that time. In particular, Blech points to Sorkin's response to the question, "Have you ever heard Richard Blech ask Ken Lynch to provide him with personal legal advice," with the statement, "I [Sorkin] would say that's a fudgy question, because in the context of those meetings ... I think there were times where Mr. Blech may have turned to Mr. Lynch for advice or asked questions." Tr. at 26.

A lack of clarity as to the nature of the advice Blech sought from Lynch, i.e., it was "fudgy," does not satisfy the *Teamsters* test. Blech must demonstrate, not that there was a lack of clarity, but rather that he "made it clear" that he was seeking personal advice and that Lynch "saw fit to communicate with [him] in [his] individual capacit[y], knowing that a possible conflict could arise". *Teamsters,* 119 F.3d at 215. Lynch testified to the contrary, *see* supra, and Sorkin confirmed that "it was clearly understood in my [Sorkin's] mind that Mr. Lynch was there on behalf of CBL". Tr. at 25. Finally, the question is not whether it was reasonable for Blech to assume that corporate counsel was in effect his own counsel because he was the sole shareholder of Credit Bancorp. Thus, Blech's reference to *Rosman v. Shapiro,* 653 F.Supp.

France where Blech is currently incarcerated. The Court further notes that if Blech were not contesting his extradition to this country then

of course he would be able to testify in person.

1441 (S.D.N.Y.1987) is inapposite. *See Teamsters,* 119 F.3d at 215–16 (rejecting "reasonable belief" standard for finding personal attorney-client privilege between corporate counsel and corporate officer).

### Sorkin's Authority to Make The Statements on December 2 and 3

On December 2, 1999, Sorkin made certain statements to SEC staff on behalf of Blech in which Sorkin corrected prior representations as to whether securities had been margined by Credit Bancorp.

On December 3, 1999, in a proceeding before this Court, Sorkin again made statements directed at correcting prior representations regarding the margining of securities by Credit Bancorp. Sorkin represented to the Court on December 3 that Blech had authorized him to make these statements to it as well as to the SEC and the Receiver. Subsequently, in a Declaration dated March 15, 2000, Blech denied that he had authorized Sorkin to make these statements.

At the May 16 hearing, Sorkin testified that Blech authorized him to make the statements at issue to the SEC on December 2 and the Court on December 3. Tr. at 18, 25–26. The Court finds Sorkin's testimony to be credible, and that in fact Sorkin was so authorized.

Blech contends that even if Sorkin's testimony is found credible that this Court cannot find that he authorized the statements on December 2 and 3.

■ Blech avers that Sorkin could not have knowingly and intelligently authorized Sorkin to make incriminating admissions on Blech's behalf due to a conflict of interest arising from Sorkin's simultaneous defense of Blech and defendant Thomas Rittweger ("Rittweger"). The authority cited by Blech, *United States v. Blau,* 159 F.3d 68 (2d Cir.1998), concerns a different issue, namely, when a criminal defendant's right to effective assistance of counsel under the Sixth Amendment is violated due to a conflict of interest. Blech's Sixth Amendment rights were not implicated in December, 1999. *See, e.g., McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204,

115 L.Ed.2d 158 (1991) (Sixth Amendment right to counsel does not attach until "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment").

Moreover, even under the *Blau* standard, Blech must show either that Sorkin had " '(1) a potential conflict of interest that resulted in prejudice ... or (2) an actual conflict of interest that adversely affected the attorney's performance.' " *Blau,* 159 F.3d at 74 (citation omitted). Sorkin testified that he believed, and so advised Blech, that it was in Blech's best interest to cooperate with the government. Tr. at 24, 29–30. There is no evidence that Sorkin's advice to Blech was tainted by a conflict of interest with respect to Sorkin's representation of Rittweger. That Sorkin was also aware that the statements he made on December 3, 1999 were incriminating, would be part of the public record, would be binding, and would be available for use against Blech in a criminal investigation, shows only that Sorkin was aware that there were consequences to such statements—consequences of which he advised Blech. Tr. at 29–30. Sorkin's awareness of these consequences does not obviate his testimony that he acted on the premise that Blech's best option was to cooperate. Tr. at 24, 29–30. Thus, Blech has not demonstrated that he suffered prejudice due to a conflict of interest on the part of Sorkin, and cannot claim based on such a conflict that he did not knowingly and intelligently authorize Sorkin to make the statements at issue.

Blech further contends that, even if Sorkin was authorized to make certain admissions to the SEC and the United States Attorney, Sorkin exceeded the scope of his authorization when he made these same statements in open court on December 3, 1999. Blech characterizes Sorkin as having testified that his authority to make the statements in open court was derived from Blech's presence while Sorkin made similar statements to the SEC and the United

States Attorney's Office and any authorization to make such non-public statements. This characterization, however, is inaccurate. Sorkin testified specifically that he explained to Blech the need to correct misrepresentations made to the Court on November 17 and 24, 1999 regarding whether securities had been margined by Credit Bancorp, and that Blech authorized him to do so. Tr. at 25–26. Sorkin then appeared before the Court on December 3 and made the authorized statements. Nor does Sorkin's testimony that his corrections of prior misrepresentations were "within the constraints of the attorney-client privilege," obviate his authorization to make these specific statements. Tr. at 25.

Finally, Blech's reliance on Rule 11 to show that Sorkin's statements before this Court were outside the scope of his authority is unavailing. This is not a case where statements were made to the United States Attorney as part of plea discussions and then improperly admitted in this civil proceeding on December 3. *See* Fed. R.Crim. Proc. 11(e)(6). Rather, the Court finds that Blech independently authorized Sorkin to make the statements to both the Court and the SEC. Indeed, the meeting with the United States Attorney occurred on December 15, that is, after the proceeding on December 3. If anything, the meeting with the United States Attorney indicates an ongoing plan of cooperation which included the events of December 2 and 3 and further supports Sorkin's testimony that he had authorization on those earlier dates.

### Conclusion

Therefore, the Court finds that Lynch did not represent Blech in his personal capacity, and concludes that there is no personal attorney-client privilege as between Lynch and Blech. The Court further finds that Sorkin's statements on Blech's behalf to the SEC on December 2, 1999, and to this Court on December 3, 1999, were authorized by Blech.

It is so ordered.